Raul Domingo SANTIAGO, Petitioner,

v.

IMMIGRATION & NATURALIZATION
SERVICE, Respondent.

Benjamin PAGLINAWAN, Petitioner,

v.

IMMIGRATION & NATURALIZATION
SERVICE, Respondent.

Vicente Ada CATAM, Petitioner,

v.

IMMIGRATION & NATURALIZATION
SERVICE, Respondent.

Muhammad Aslam KHAN, Petitioner,

v.

IMMIGRATION & NATURALIZATION
SERVICE, Respondent.

Nos. 73–2497, 73–2499, 73–2498
and 73–2462.

United States Court of Appeals,
Ninth Circuit.

Oct. 31, 1975.

Robert S. Bixby (argued), of Fallon, Hargreaves, Bixby & McVey, San Francisco, Cal., for Muhammad Aslam Khan.

Donald L. Ungar (argued), of Phelan, Simmons & Ungar, San Francisco, Cal., for Santiago, Paglinawan and Catam.

Bernard Hornbach, Atty. (argued), of Immigration & Naturalization Service, San Francisco, Cal., for respondent.

## OPINION

Before CHAMBERS, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE, SNEED and KENNEDY, Circuit Judges.

SNEED, Circuit Judge:

These four cases present the question whether, on the particular facts of each, the action of an immigration officer in admitting an otherwise excludable alien estops the Government from asserting such excludability at entry as a basis for deportation. We hold estoppel to be unavailable in each case.

The petitioner in each case was granted an immigrant visa under 8 U.S.C. § 1153(a)(9) as the husband or child of a person entitled to a preference under the Immigration and Nationality Act, 8 U.S.C. § 1153(a)(2), (4). The visa of each petitioner was valid only if he were "accompanying, or following to join, his spouse or parent." 8 U.S.C. § 1153 (a)(9).[1] Each petitioner traveled to the United States alone and was admitted by an immigration officer. Death or expiration of the visa of the spouse or parent who held the preference prevented the spouse or parent from later joining the petitioner in the United States.

After hearings, the INS determined that the petitioners were excludable at entry and, pursuant to 8 U.S.C. § 1251(a)(1),[2] ordered them to voluntarily leave the country or be deported. The Board of Immigration Appeals dismissed their appeals and they thereafter petitioned for review in this court.[3]

1. 8 U.S.C. § 1153(a)(9):

(9) A spouse or child . . . shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa or to conditional entry under paragraphs (1) through (8) of this subsection, be entitled to the same status, and the same order of consideration provided in subsection (b) of this section, if accompanying, or following to join, his spouse or parent.

2. 8 U.S.C. § 1251(a)(1):

(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry;

3. The Government raises a preliminary procedural objection to the timeliness of Khan's petition for review in No. 73–2462. The Board issued its decision on April 17, 1972, Khan filed a motion to reopen, for the first time arguing his theory of estoppel, on May 22, 1972. The Board did not deny this motion until July 18, 1973, that decision being amended on July 26, 1973. Petition for review was filed on August 6, 1973.

The Act provides that "a petition for review may be filed not later than six months from the date of the final deportation order . . ." 8 U.S.C. § 1105a(a)(1). We can review denial of a motion to reopen if a petition for review is filed within six months of that denial, but our review in that case ordinarily is limited to consideration of abuse of discretion. Loza-Bedoya v. I. N. S., 410 F.2d 343, 346 (9th Cir. 1969). We have held, however, that a motion to reopen filed within six months of the final deportation order tolls the six-month deadline for filing a petition for review, and that a new six-month period for so filing commences with the denial of the motion to reopen. Bregman v. I. N. S., 351 F.2d 401, 402–03 (9th Cir. 1965). See also Woodby v. I. N. S., 385 U.S. 276, 286–87, 87 S.Ct. 483, 17 L.Ed.2d 362 n. 20 (1966); Yamada v. I. N. S., 384 F.2d 214, 215–16 n. 3 (9th Cir. 1967). Therefore, even though Khan's petition for review was filed 16 months after the decision by the Board of Immigration Appeals, he falls within the Bregman exception and we have jurisdiction to review the original deportation decision as well as the Board's exercise of discretion in denying the motion to reopen.

Although Khan did not offer his theory of estoppel until his motion to reopen, we need not for that reason limit our inquiry to determining whether the Board's refusal to reopen the hearing to study this new theory was an abuse of discretion. Past cases refusing to

### Facts

In No. 73–2497, the wife of petitioner Santiago was entitled to a fourth preference visa as a married daughter of a United States citizen. 8 U.S.C. § 1153(a)(4). The American consul in Manila issued visas to Santiago and his wife at the same time but, because of financial difficulties, Santiago traveled to the United States alone with the intention of earning the money to pay for his wife's ticket. Santiago testified that the Honolulu immigration officer stamped his visa and wrote "P4–2" on it in pen, a code indicating that he held his visa because of the preferred status of a wife or parent. The officer nevertheless admitted Santiago without inquiring where his wife was. The record is unclear whether Santiago knew at that time that his visa was invalid because he was not accompanying or following his wife. Santiago worked for two years in San Francisco and saved the money to bring over his wife and children. By this time, however, his wife's visa had expired and he therefore petitioned for the admittance of his family as relatives of a lawfully admitted resident alien. 8 U.S.C. § 1153(a)(2). The legality of Santiago's own presence was then challenged.

The facts in Nos. 73–2498 and 73–2499 are similar to each other and those surrounding Santiago's entry. The wives of petitioners Catam and Paglinawan did not accompany them because of illness. Both petitioners were admitted by immigration officers at Honolulu without question. The record is unclear whether Catam knew that his visa was invalid.

There is no evidence that Paglinawan had such knowledge.

In No. 73–2462, the father of petitioner Khan held a fifth preference visa as the brother of a United States citizen. 8 U.S.C. § 1153(a)(5). Petitioner Khan held a P5–3 visa as a child "accompanying, or following to join" his father. This visa was valid for only one month, expiring on Khan's twenty-first birthday. See 8 U.S.C. § 1101(b)(1). Because of this deadline, Khan left Pakistan before his father. The New York immigration officer inquired concerning Khan's father and learned that Khan was preceding his father to the United States. Despite this knowledge, the officer admitted Khan. While Khan had been en route his father had died. There is no evidence that Khan knew of his father's death prior to Khan's entry into the United States nor is there evidence suggesting that Khan knew that his entry was in violation of the "accompanying, or following to join" requirement.

### Statutory Construction

■ Petitioners initially contend that the words "accompanying, or following to join" in 8 U.S.C. § 1153(a)(9) should be construed to also mean "preceding with the hope [or expectation] of being joined later." There is no authority for such a construction. The plain language of the statute is designed to assure that those aliens who derive their preference cannot exercise their right to enter until the person from whom they derive their preference has actually entered. Congress clearly intended to preserve family

---

consider issues not raised at the administrative level have involved administrative procedural defects easily remedied by the agency if its attention had been earlier called to them. *Chung Young Chew v. Boyd,* 309 F.2d 857 (9th Cir. 1962); *Chi Sheng Liu v. Holton,* 297 F.2d 740 (9th Cir. 1961). The record in these four cases demonstrates that it would have been futile for Khan to have raised the estoppel issue earlier. The rule against our considering the issue for the first time on appeal is one of prudence and is not inflexible. *K–2 Ski Co. v.*

*Head Ski Co., Inc.,* 506 F.2d 471, 475 (1974); *Pilapil v. I. N. S.,* 424 F.2d 6, 9 (10th Cir.) *cert. denied,* 400 U.S. 908, 91 S.Ct. 152, 27 L.Ed.2d 147 (1970); *Green v. Brown,* 398 F.2d 1006 (2d Cir. 1968); *Nuelsen v. Sorensen,* 293 F.2d 454, 462 (9th Cir. 1961); C. Wright, Law of Federal Courts § 104 at 468 (2d ed. 1970). We believe it only just to treat Khan on the same basis as the other three petitioners, rather than examine the Board's decision simply for abuse of discretion.

unity by this language and to permit the lawfully entering alien to either bring his family with him or to send for them later when he had the ability to do so. But there is nothing in this language to indicate that Congress ever intended that the grant of a preference to one alien would effectively work a grant of a like preference to the members of his family so that they might enter at whatever time they wished. If Congress had wished to equate derivative preferences with actual preferences the words "accompanying, or following to join" would be absent from this statute.

## Estoppel

In asserting that the Government should be estopped from asserting their excludability at entry as a basis for deportation, each petitioner alleges that he was unfairly misled into the belief that his entry was lawful. Each petitioner points to three of the four following factors as the basis of his alleged reliance on the presumed validity of his entry:

(a) failure of the consular official who issued his visa to fully inform the petitioner of the "accompanying, or following to join" requirement. (Santiago,[4] Catam, Paglinawan, Khan)

(b) failure of the immigration officer at the point of entry to inform the petitioner of that requirement. (Santiago, Catam, Paglinawan, Khan)

(c) failure of the immigration officer at the point of entry to inquire concerning the whereabouts of the spouse entitled to preference, thereby failing to determine whether the requirement had been met. (Santiago, Catam, Paglinawan)

(d) failure of the immigration officer to deny entry after learning that the requirement had not been met. (Khan)

Petitioners argue that the proper standard of estoppel against the Government is that which we applied in *United States v. Georgia-Pacific Co.,* 421 F.2d 92 (9th Cir. 1970).[5] The elements of estoppel against the Government set out there, they say, are also found in the present cases. Georgia-Pacific was not an immigration case but a suit by the Government seeking specific performance of a contract to convey land.[6] We have never held the particular formulation of equitable estoppel applied against the Government there to be applicable in an immigration case, nor do we need to reach that question here.[7] Whatever the rule of estoppel may be in immigration cases, it can only be invoked if the governmental conduct complained of amounts to "affirmative misconduct" as that term was used in *INS v. Hibi,* 414

---

4. There is evidence that the consular official at Manila gave Santiago some information concerning the requirement. Santiago contends, however, that he was not "fully" informed.

5. In *Georgia-Pacific* we applied the same four element test to estop the Government which is used in private actions. *See Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir. 1960). The four elements needed to establish estoppel are:

(1) The party to be estopped must know the facts;
(2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;
(3) the latter must be ignorant of the true facts; and
(4) he must rely on the former's conduct to his injury.

421 F.2d at 96.

6. In *Georgia-Pacific* we stated that "In the instant case, the Government is suing to enforce a contract between it and a third party, and is thus acting as a private party would." 421 F.2d at 101. We were careful to point out that the Government was acting in its "proprietary role" rather than its "sovereign role." In the latter role, "the Government is carrying out its unique governmental functions for the benefit of the whole public." *Ibid.* We need only note here that regulation of immigration and citizenship are peculiarly sovereign functions.

7. One district court has applied the *Georgia-Pacific* formulation to estop the Government in an immigration case. *Gestuvo v. INS,* 337 F.Supp. 1093 (C.D.Cal.1971). By Order dated May 15, 1974, we reversed *Gestuvo* and remanded for reconsideration in light of *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973).

U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973). We find no "affirmative misconduct" on the facts now before us.

In *Hibi* the Supreme Court reversed a decision of this circuit, 475 F.2d 7 (9th Cir. 1973), which had held the Government to be estopped from asserting delay in filing as a basis for rejecting a petition for naturalization. Hibi had sought naturalization in 1967 under §§ 701–05 of the Nationality Act of 1940 which provided for naturalization of noncitizens who had served honorably in the Armed Forces of the United States during World War II. Hibi, a native of the Philippines, was a member of this class but his 1967 petition did not meet the Act's requirement that all petitions be filed no later than December 31, 1946. He asserted estoppel against the Government based on the Government's "failure to advise him, during the time he was eligible, of his right to apply for naturalization, and from [INS's] failure to provide a naturalization representative in the Philippines during all of the time [Hibi] and those in his class were eligible for naturalization." 414 U.S. at 7–8, 94 S.Ct. at 21.

There is no doubt that the course of conduct pursued by INS to the detriment of Hibi was a serious breach of duty by Government officials. We stated that the Government had "denied petitioner of a fair opportunity to apply for naturalization during the only time he could apply" and that the conduct of the responsible officials was "in derogation of their duty to carry out an Act of Congress." 475 F.2d at 10, 11. The dissent of Mr. Justice Douglas in *Hibi* characterized this conduct as "the deliberate—and successful—effort on the part of agents of the Executive Branch to frustrate the congressional purpose and to deny substantive rights to Filipinos such as [Hibi] by administrative fiat." 414 U.S. at 11,

94 S.Ct. at 23. Nevertheless, a majority of the Court held estoppel to be unavailable against the Government on those facts, stating that:

> While the issue of whether "affirmative misconduct" on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy,* 366 U.S. 308, 314, 315, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), no conduct of the sort there adverted to was involved here. We do not think that the failure to fully publicize the rights which Congress accorded under the Act of 1940, or the failure to have stationed in the Philippine Islands during all of the time those rights were available an authorized naturalization representative, can give rise to an estoppel against the Government.

414 U.S. at 8–9, 94 S.Ct. at 21.

By stating its holding in this manner the Court in *Hibi,* as it did in *Montana v. Kennedy,* avoided any express statement that estoppel is *ever* available in a citizenship or immigration case.[8] But neither case disturbs the Court's decision in *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951), which we have read to justify relief in the nature of estoppel in an immigration case, *see Tejeda v. INS,* 346 F.2d 389, 394–95 (9th Cir. 1965), and we continue to believe that estoppel is available in such cases where the particular facts warrant it. But it is the clear import of *Hibi,* if not its holding,[9] that estoppel can only be available in the citizenship and immigration context where there has been "affirmative misconduct" on the part of the Government.

The Court in *Hibi* did not elaborate on the meaning of "affirmative misconduct" and we do not believe that it would be productive to dwell overlong on the possible reasons for the inclusion of the

---

8. While both *Hibi* and *Montana v. Kennedy* concern citizenship rights, we find their discussions of estoppel to be fully applicable to immigration questions.

9. In *Hernandez v. INS,* 498 F.2d 919, 921 (9th Cir. 1974), we said that *Hibi* "held that except for 'affirmative misconduct' on the part of the Government, the United States could not be estopped from denying citizenship under the facts existing there."

modifier "affirmative." That term, as well as the use in *Hibi* of a quotation from *Utah Power & Light Co. v. United States* concerning "neglect of duty,"[10] suggests that a distinction might be drawn between nonfeasance and misfeasance. But these are slippery terms. The two "failures" in *Hibi* can be viewed as either, a point which Mr. Justice Douglas made in characterizing the governmental conduct there as a "deliberate effort." The same semantic problem exists here. There was alleged nonfeasance in the failure to inform or inquire as well as alleged misfeasance in the act of admission. Misfeasance is particularly stressed in the case of petitioner Khan for the immigration officer there knew that Khan's father remained in Pakistan. But it is obvious to us that the central complaint of each petitioner is not the act of admission but the failure to inform or inquire. This is equally true in the case of Khan who, in attempting to show reliance, argues that the immigration officer failed to tell him that his visa was invalid. We therefore weigh these failures against those in *Hibi*. Only if they are more blameworthy are we entitled to depart from its teaching.

In *Hibi* there was a failure to "fully publicize" the citizenship rights of Filipino servicemen. The failures to inform of immigration requirements here do not appear to be more blameworthy than those in *Hibi*. Moreover, the Government officials in *Hibi* acted in derogation of duty while no duty to inform has been established in this case. If there was governmental "misconduct" here it is of a less serious nature than that in *Hibi*. Likewise the result of the government's failures here is less serious. Hibi lost his opportunity, granted by Act of Congress, to be naturalized as a United States citizen. Petitioners here have lost no rights to which they were entitled under the immigration laws. At the time of that admission, none had any right to enter. While it is true that the petitioners, other than Khan, might have been able to return to their homes and reenter accompanied by their wives if they had been informed by the immigration officer of the "accompany, or following to join" requirement, that officer's inaction did not directly deprive them of the opportunity to do so. Weighing the particular facts before us against those in *Hibi*, we find the failures here less blameworthy. Therefore, we hold estoppel against the Government to be unavailable. The decision of the Board of Immigration Appeals in each of these cases is

Affirmed.

CHOY, Circuit Judge, with whom Judges BROWNING, ELY and HUFSTEDLER join, concurring and dissenting:

I concur in that portion of the majority opinion construing 8 U.S.C. § 1153(a)(9).

However, I must dissent from the paltry view which the majority of my brethren take of the doctrine of estoppel as applicable to the Government.

Each of the immigrants concerned was poor, unlearned and ignorant[1] of the technicalities of United States immigration law. Each was utterly dependent in his immigrational processing upon the advice and acts of the "authorities," first in his country of origin, then at the port of entry into the United States. The visa of each was plainly marked with the legend "P4–2" or "P5–3" indicating that the paper was valid only if he were "accompanying, or following to join, his spouse or parent." 8 U.S.C. § 1153(a)(9).[2] The visa of each was en-

---

10. "As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest . . . . *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917)." 414 U.S. at 8, 94 S.Ct. at 21.

1. Two of the appellants, Santiago and Catam, possibly were aware when they entered that their spouses must accompany them. I would have that fact determined on remand.

2. *See* footnote 1, majority opinion.

dorsed with the admitting immigration officer's stamp and the marking "P4–2" or "P5–3" in the officer's own handwriting. Santiago, Paglinawan and Catam each accepted prolonged separation from his family, and labored and scrimped funds with which eventually to become reunited with them; Khan's father died leaving Khan's mother surviving in Pakistan. Each established a new life in this country in good faith.

The Government of the United States of America now seeks to eradicate that new life, but not for any malefaction, culpability, or even indiscretion on the part of any one of the immigrants. The Government seeks to deport him because an errant immigration officer, its agent, who knew or had reason to know better, gave entrance to the inadmissible innocent.

I would hold the Government subject to the doctrine of estoppel under the facts confronting us. Equitable estoppel is a rule of fairness by which courts protect the reliances and expectations of innocent persons from defeat by those who have induced those reliances and expectations. *Russell v. Texas Co.,* 238 F.2d 636, 640 (9th Cir. 1956), *cert. denied,* 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957). As a device of equity, it is applied so as to best safeguard the interests of both parties. Courts traditionally have been reluctant to apply equitable estoppel to the Government, however. They have assumed, most often tacitly, that to hold estopped the enforcement of public laws would endanger interests of the public far outweighing those of individual parties injured through reliance on acts or conduct of public officials. *See, e. g., Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

Recent decisions have refused to cast this reluctance as an inflexible rule, however. Instead, courts have undertaken to balance the equities in each individual case. Thus, we have held that estoppel applies to the United States "where justice and fair play require it,"

*United States v. Lazy FC Ranch,* 481 F.2d 985, 988 (9th Cir. 1973); that "a person might sustain such a profound and unconscionable injury in reliance on [an official's] action as to require, in accordance with any sense of justice and fair play, that [he] not be allowed to inflict the injury," *Schuster v. CIR,* 312 F.2d 311, 317 (9th Cir. 1962); and that "administrative regularity must sometimes yield to basic notions of fairness," *Brandt v. Hickel,* 427 F.2d 53, 57 (9th Cir. 1970). *See also Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951); *Hetzer v. I. N. S.,* 420 F.2d 357 (9th Cir. 1970).

I am reluctant, of course, to allow congressional policy to be frustrated by the acts of a single, careless official. On the other hand, I do not impute to Congress the desire to inflict needless hardship and suffering on legally ignorant and blameless immigrants like those here, who have been misled by the Government's derelict administration of immigration laws. In these cases, injustice to the individuals outweighs any harm to public policy.

When an immigration officer unavoidably ignorant of facts rendering an alien excludable allows him to enter the country, the Act without question permits the alien to be deported when the facts become known. 8 U.S.C. § 1251(a). *See, e. g., Hernandez v. I. N. S.,* 498 F.2d 919 (9th Cir. 1974). In *Hernandez,* nothing on the face of the immigrant's visa indicated that she was excludable for having assisted in the illegal entry of aliens two years earlier. But when an officer knew or had reason to know, as here, that the alien should have been excluded, I think it only fair to invoke estoppel. In each of the four cases before us, the immigration officer failed to exercise the minimal care necessary to ascertain whether the alien met the requirements indicated by his visa. In one case, the immigrant (Khan) actually told the officer that he was preceding his father, in unknowing violation of terms of the visa and the Act. He was nonetheless admitted. The Government's attorney lamely speculat-

ed: "You might say it might be a loose practice—you can put it that way." Such "loose practices" of the Government causing unnecessary hardships to human beings should not be condoned.

The majority acknowledges that relief in the nature of estoppel is justified in immigration cases where the particular facts warrant it, citing *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951) and *Tejeda v. INS,* 346 F.2d 389, 394–395 (9th Cir. 1965). But, the majority asserts that the Supreme Court in *INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), has declared that "estoppel can only be available in the citizenship and immigration context where there has been 'affirmative misconduct' on the part of the Government." Having paraphrased appellants' factual claims in negative terms, the majority concludes, "We find no 'affirmative misconduct' on the facts now before us."

"Affirmative" and "negative," like "misfeasance" and "nonfeasance," are indeed slippery terms. Each one of the claims paraphrased negatively can readily be restated affirmatively; *e. g.,* the immigration officer admitted Khan even after learning that Khan was not accompanying or following to join his father. But it is not *how* we cast the facts, but the facts themselves that should dictate the nature of relief warranted.

In *Hibi,* it is true, the Court denied estoppel relief based on the "failure to fully publicize" the right of an ex-Philippine Scout to apply for naturalization and the "failure to have stationed" in the Philippines a naturalization representative during all the period Hibi was eligible for naturalization. 414 U.S. at 9, 94 S.Ct. 19. Still, the Court intimated that conduct adverted to in *Montana v. Kennedy,* 366 U.S. 308, 315, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), might be "affirmative misconduct" warranting estoppel in cases of this nature. *Id.* at 8, 94 S.Ct. 19. *Montana* refers the reader to *Podea v. Acheson,* 179 F.2d 306 (2d Cir.

1950), and *Lee You Fee v. Dulles,* 236 F.2d 885, 887 (7th Cir. 1956).

In *Podea,* a United States citizen living in Romania asked the American consul there for a United States passport in order to avoid Romanian military service. The consul refused the passport on the basis of an erroneous ruling of an official in the State Department that Podea had lost his United States citizenship. Podea was conscripted into the Romanian army and took its oath of allegiance. Held: Podea did not voluntarily expatriate himself since his acts were primarily caused by erroneous advice of the State Department.

*Lee You Fee* itself presents no case of estoppel, but at 236 F.2d 887 discusses three cases that did; *Lee Bang Hong v. Acheson,* 110 F.Supp. 48 (D.Haw.1951); *Lee Hong v. Acheson,* 110 F.Supp. 60 (N.D.Cal.1953); and *Lee Wing Hong v. Dulles,* 214 F.2d 753 (7th Cir. 1954). In all three cases, foreign-born United States citizens who made timely applications for entry documents were prevented from reaching the United States by their sixteenth birthdays because the American consular officials abroad refused to issue or delayed issuance of the documents. Held: The failure of the consular officials did not divest those persons of their United States nationality. As the court in *Lee You Fee* commented about these three cases: "Certainly the Government should not be heard to contend that a plaintiff had been deprived of his citizenship because of the failure of the plaintiff to do something which the officials of the Government had carelessly or willfully prevented his doing." 236 F.2d at 887.

It is unclear, therefore, what behavior the Supreme Court considers to be "affirmative misconduct." Certainly the governmental conduct "adverted to" in *Montana v. Kennedy* partook more of the nature of error or carelessness than of the extreme blameworthiness which the majority apparently contemplates as the only basis for estoppel. Rather than juggle the terminology found in the *Hibi*

opinion, I would inquire into the interests which the *Hibi* Court sought to protect.

As my Brother Sneed observes, we have not hesitated to apply estoppel to the Government when it acts in its proprietary, rather than its sovereign, capacity. *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970). We have not rested our decisions on whether we categorized acts as proprietary or sovereign, however; we have simply recognized that protection of the public welfare and deference to congressional desires is much more apt to outweigh hardships to private individuals in the equitable balance when estoppel is asserted against sovereign acts. *Lazy FC Ranch, supra,* 481 F.2d at 989 n. 5; *see Union Oil Co. of California v. Morton,* 512 F.2d 743, 748 n. 2 (9th Cir. 1975).

The conduct at issue in *Hibi* was not the negligence or malfeasance of minor officials, but a deliberate decision of policy by the Attorney General. Although acting in the face of a contrary congressional purpose, the executive branch was attempting to advance diplomatic relations between the United States and the government of the Philippines.[3] Regardless of whether the Government's conduct constituted an abuse of discretion, its decisions were so patently of the type committed to the executive branch that the Court was extremely reluctant to nullify them over 20 years later in order to relieve one individual instance of hardship.

These petitioners, on the other hand, have not been harmed by a deliberate policy undertaken for reasons of state, but by inattention to their duties by low-ranking immigration officers. Estoppel by its nature is a balancing of equities and interests. The Supreme Court did not hold in *Hibi* that estoppel would never apply against the Government, or that it would never so apply in immigration cases; the Court set no firm guidelines which control this decision. I see no evidence that insistence on immigration officers' properly performing their duties under facts as presented here will frustrate attainment of goals set by Congress and the I.N.S. The harm suffered by the immigrants here, misled by their apparently lawful entrance into this country, far outweighs any administrative inconvenience resulting to the I.N.S. from application of estoppel.

I would invoke estoppel and reverse as to Paglinawan and Khan, and vacate and remand for further proceedings as to Santiago and Catam.[4]

**3.** "After the Japanese occupation of the Philippines ended, an American vice-consul was authorized to commence naturalization proceedings in 1945. Almost immediately thereafter, the Philippine Government expressed its concern about Filipino men leaving the Territory after being granted American citizenship. In response to these concerns, the Commissioner of Immigration, on September 13, 1945, wrote a letter to the Attorney General recommending that the 'situation . . . be handled by revoking the authority previously granted [the vice-consul] and by omitting to designate any representative authorized to confer citizenship in the Philippine Islands. . . .' The Commissioner's recommendation was approved by the Attorney General on September 26, 1945, and the authority of the vice-consul to naturalize alien service-men immediately revoked." 414 U.S. at 10–11, 94 S.Ct. at 22 (Douglas, J., dissenting.)

**4.** *See* note 1.