NATIONAL TREASURY EMPLOYEES UNION et al., Plaintiffs,

v.

Ronald W. REAGAN et al., Defendants.

Melody A. TROTT, Plaintiff,

v.

Ronald W. REAGAN et al., Defendants.

Marc R. WINE et al., Plaintiffs,

v.

Ronald W. REAGAN et al., Defendants.

NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES et al., Plaintiffs,

v.

Ronald W. REAGAN et al., Defendants.

Elaine M. BOUTILIER, Plaintiff,

v.

Ronald W. REAGAN et al., Defendants.

Civ. A. Nos. 81–0195, 81–0198, 81–0199, 81–0240 and 81–0284.

United States District Court, District of Columbia.

Feb. 26, 1981.

Joseph B. Scott, Irving Kator, Kator & Scott, Washington, D. C., for plaintiffs Marc R. Wine et al.

Robert M. Tobias, John F. Bufe, Sharyn Danch, William F. White, National Treasury Emp. Union, Washington, D. C., for plaintiffs National Treasury Emp. Union and Elaine M. Boutilier.

Philip L. Chabot, Jr., Carol MacKinnon, Duncan, Weinberg & Miller, P. C., Washington, D. C., for plaintiff Melody A. Trott.

Michael J. Grealy, Raymond J. Malloy, National Ass'n of Government Emp., Washington, D. C., for plaintiffs Nat. Ass'n of Government Emp. et al.

Phillip Sturman, John J. Boyd, Jr., Smith, Somerville & Case, Baltimore, Md., for intervenor in No. 81–0195.

Alphonse M. Alfano, Shiela Lieber, R. Lawrence Dessem, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION AND SUMMARY OF ARGUMENT

The Court has before it complaints in five (5) cases which have been consolidated for all purposes.[1] All seek declaratory and injunctive relief in the form of cross-motions for summary judgment, there being no material facts in dispute growing out of President Reagan's hiring freeze signed on January 20, 1981, and by its terms made effective from November 5, 1980, forward.[2] The plaintiffs also seek damages in amounts less than $10,000.00. The Presidential action was followed by two bulletins issued pursuant thereto by Acting Director McComber of the Office of Management and Budget and David Stockman, the Director of OMB.[3] The President's hiring freeze and the two subsequent bulletins contained provisions for exemption from such freeze in certain limited circumstances generally on the basis of hardship and the essential character of the work to be performed. It appears that some of the class members herein have been granted such exemptions since this litigation commenced on January 28, 1981.

The plaintiffs herein have all sought to be certified as a class within the meaning of Rule 23(b)(1) and (2) of the Federal Rules of Civil Procedure. The Court has considered this question and, by separate Order issued today, has *conditionally* certified the class

---

1. *See* Order of Consolidation entered by consent herein on February 16, 1981.

2. President Reagan's hiring freeze dated January 20, 1981, is appended hereto as Exhibit A and incorporated herein by reference.

3. The two Office of Management and Budget bulletins are appended hereto and incorporated herein by reference.

for the reasons stated therein. Although not pertinent to the propriety of the class action, the Court notes that this action will also facilitate the processing of this litigation at the least possible cost and in the least amount of time.

■ At the outset, it must be understood that the courts have a limited role in this area of federal employment relations. *See Yacavone v. Bolger, Postmaster General of the United States,* 645 F.2d 1028 (D.C. Cir. 1981). As long as the decision here involved was not arbitrary and capricious and did not otherwise violate the Constitution, laws of Congress or any relevant procedural requirements, the decision of the President and his inferior officers with respect to the hiring freeze must be affirmed. After careful analysis of the applicable law, including the Constitution, Congressional enactments, regulations, and judicial decisions, it appears clear that the instant claims cannot be sustained because they are based upon mere offers of jobs which do not rise to the level of "appointments" to the federal civil service between the time frame of November 5, 1980, and January 20, 1981.

■ The plaintiffs also argue that the President's action was retroactive from the time he took office to the day after the 1980 Presidential Election and was, therefore, invalid. This cannot withstand legal analysis because the plaintiffs merely got "offers" or "expectations" of jobs from people with or without authority to make appointments to the federal civil service, and, since the claimants did not execute or complete the Office of Personnel Management Forms 50 or 52, and, since this was a *discretionary act,* it did not affect legitimate or vested rights of any claimant accruing prior to January 20, 1981.

■ Next, the plaintiffs argue that even if they did not have a valid "appointment", the offers created a protected property interest based upon substantive and procedural due process considerations under the Fifth Amendment. This, again, is erroneous because, as indicated, they were not "appointed" to their jobs but at best had only an *expectancy* as opposed to a protected property interest.

Lastly, the plaintiffs assert that the defendants and their agents are estopped from denying their employment, whether or not they were "appointed" (which they were not). As the defendants point out in their Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, the Supreme Court, from the very beginning of the Republic, has recognized the rule that the government cannot be estopped even though hardship to private parties might result in individual cases. *Lee v. Munroe and Thornton,* 11 U.S. (7 Cranch) 366, 3 L.Ed. 373 (1813). This principle is founded on the view that a contrary rule would make it "very difficult for the public to protect itself." *Id.* at 369.

■ Plaintiffs, however, assert that this principle which exempts the government from the normal principles of equitable estoppel only applies to unauthorized acts of agency officials. Therefore, it is argued that estoppel does apply to the government when letters were sent by agents with appointment authority. However, even when applying the elements of equitable estoppel to defendants' authorized actions, the requirements are not met. The Supreme Court, in *Immigration and Naturalization Service v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), implicitly acknowledged that the government might be estopped for its "affirmative misconduct," and, subsequently, the Ninth Circuit has held that this requires a showing of an affirmative misrepresentation or affirmative concealment of material facts. *See Santiago v. INS,* 526 F.2d 488 (1975), *cert. denied,* 425 U.S. 971, 91 S.Ct. 2167, 48 L.Ed.2d 794 (1976). *See also Parker v. Sager,* 174 F.2d 567, 661 (D.C.Cir.1948). It is undisputed that the government officials who notified plaintiffs of their selection for federal jobs *did so in good faith* and *did not misrepresent* the true facts or attempt to conceal a material fact. Thus, even if the doctrine of estoppel applied here, the first element of the doctrine as it relates to the party estopped is missing.

■ In conclusion, the hiring freeze is neither unconstitutional nor otherwise contrary to law and it is supported by explicit statutory authority. *See* 5 U.S.C. § 3301(1); 31 U.S.C. § 18a. Moreover, President Reagan's action freezing federal employment at November 5, 1980 levels is addressed to the problems of efficiency and economy in the executive departments and establishments of the United States. It is in accord with the President's constitutional duty to "take care that the laws of the United States shall be faithfully executed"[4] as implemented by appropriate congressional enactments which authorize the President to prescribe such regulations for the admission of individuals into the civil service in the executive branch *as will best promote the efficiency of that service.* 5 U.S.C. § 3301(1). The President is also obliged to direct that the executive department and establishments make such changes as may be necessary *to secure greater economy and efficiency in the conduct of the public service.* 31 U.S.C. §§ 18 and 18a.

■ In addition to the foregoing, the judiciary is legally bound to give deference to the presumption of regularity of the actions taken by a coordinate and equal branch of government (here the executive) unless it is contrary to law. Therefore, this Court cannot and should not intervene because the President's actions are not only constitutional and legally permissible, but, as asserted by the President in his capacity as Chief Executive, they are essential for the well being and general welfare of the American people at this time.

This result reached today by the Court does not indicate any lack of concern or sympathy for those who may have thought they were about to be employed by the federal government. They and others in the civil service are essential to the general welfare and well being of this great republic. It may be difficult for those who lost and did not gain employment in the public sector this time to understand, but the Court is sure that they will agree that this is a country of law and not of men. With-

out that fundamental principle, our country could not survive.

## II. THE COURT HAS JURISDICTION OVER THE CLAIMS ASSERTED.

At the February 16, 1981 hearing, this Court requested the parties to address the limitation imposed by the Tucker Act, 28 U.S.C. § 1346, which provides, in substance, that the District Courts of the United States shall have original jurisdiction concurrent with the Court of Claims of civil actions or claims against the United States not exceeding ten thousand dollars ($10,-000.00) in amount which are "founded either upon the Constitution—or upon contract with the United States . . . ."

■ All the claims herein are either based upon the Constitution, statutes, or a contract theory. They seek declaratory and injunctive relief and have additionally requested the assessment of damages against the United States in compensation for alleged injuries sustained by them as a result of the Presidential "hiring freeze." The individual plaintiffs have amended their complaints specifically invoking the Tucker Act and limited their claims to ten thousand dollars ($10,000.00) or less. In this connection, it is noted that while a number of individual claims in a given case may exceed ten thousand dollars ($10,000.00) in the aggregate, this does not divest the Court of jurisdiction, *Zahn v. International Paper Co.,* 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973); *Holloway v. Bristol-Meyers Corp.,* 485 F.2d 986, 1002 (D.C.Cir. 1973). The Third Circuit has indicated that an individual claim of any class member for damages which would satisfy the Tucker Act is sufficient for the Court to retain jurisdiction. *Pennsylvania v. National Association of Flood Insurers,* 520 F.2d 11 (3rd Cir. 1975). It may later turn out that members of the class may assert claims in excess of ten thousand dollars ($10,000.00), in which event bifurcation would be a possibility and transfer of the claims in excess of ten thousand dollars ($10,000.00) to the

4. Article II, Section 3, Constitution of the United States.

United States Court of Claims would be another possibility. The Court will cross that bridge when it comes to it. Notwithstanding the Tucker Act, this Court is not precluded from granting declaratory and injunctive relief, even as to those persons who later take their claims for damages to the United States Court of Claims. In any event, the choice to defer to the Court of Claims is a discretionary matter. *See, e. g., Carter v. Seamans*, 411 F.2d 767 (5th Cir. 1969), *cert. denied*, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970).

### III. THE DEFENDANTS DID NOT UNLAWFULLY RESCIND VALID LETTERS OF APPOINTMENT.

It is without dispute that these consolidated actions were instituted by various individuals who received offers of employment with the federal government, which were superseded by an across-the-board hiring freeze ordered by the President of the United States on January 20, 1981, to take effect from November 5, 1980. The central issue presented is whether the plaintiffs were "appointed" to positions in the federal government before the effective date of the freeze, which was November 5, 1980.

It is also without dispute that the Office of Personnel Management is the governmental agency charged with overall responsibility for the conduct of the federal personnel management system. 5 U.S.C. § 1103. Pursuant to its properly delegated authority, OPM interprets federal statutes governing personnel matters, promulgates regulations, and otherwise advises and directs agencies regarding federal employment practices. The OPM has determined that the act necessary to effect an "appointment" is the completion of a Standard Form 50 by an "appointing official" or, in lieu thereof, of a Standard Form 52, signed by the appointing official with a selectee's entrance on duty. This obviously reflects the necessity for some form of definitive appointment action, which is the role that the Form 50 or 52 plays in triggering the prerequisites of federal employment, as well as the need to accommodate the competing federal hiring and personnel management goals and objectives of the United States. Plaintiffs contend that a letter notifying an applicant of his or her selection for federal employment is tantamount to an "appointment", regardless of whether it was sent by a person with lawfully delegated appointment authority or not. This contention is contrary to *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). In addition, it is also contrary to the necessary framework of a workable federal personnel management system because these letters of selection do not amount to an appointment, as they may not be accepted by the individual and because the government might not have funds or authority at the time of the person's attempt to enter on duty to provide work for them or pay them as indicated. The Supreme Court of the United States in *United States v. Testan*, 424 U.S. 392, 402, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1976), held that one is not entitled to the benefit of a position with the federal government until he has been duly appointed to it; and, since the plaintiffs here cannot demonstrate a property interest in federal employment that triggers rights either under federal regulation, statute or the United States Constitution, their claim must fail. Also, the plaintiffs have failed to demonstrate a right to supplant the Office of Personnel Management as the entity whose determinations on appointments govern the civil service system. Again, no appointment can be effected absent completion of a Standard Form 50 or a Standard Form 52 with the selectee's entrance on duty.

In summary, it appears to be undisputed that two elements are necessary to establish when an appointment has been made. First, the last act required for an appointment must have been performed. Second, the person or body who performed the last act must have possessed the power to make the appointment. If either of these elements is lacking, there can be no "appointment."

Here, plaintiffs who received written offers of employment failed to fulfill

the undisputed criteria for appointment as set forth above and, therefore, cannot prevail on their claims that they were appointed to positions with the federal government. In addition, even if these letters of selection were sufficient to confer appointments, they would be invalid under the circumstances of this case unless they were issued by persons who had appointment authority, which, under the undisputed facts, was not the case in every instance. Another reason for observing the authority of only appointing officials is that they must retain discretion to withhold appointments in order to prevent the agency from exceeding fiscal restraints in order to ensure compliance with the Anti-Deficiency Act, 31 U.S.C. § 665.

The government, in its Memorandum, has pointed to certain unassailable facts which makes the plaintiffs' position not only untenable, but, if adopted, would create chaos in the federal personnel management system. For example, they suggest that if letters conveying offers were deemed to constitute appointments, persons who subsequently declined those offers might have to be treated as resignees, and the government might then have to hold open positions for persons who accepted the offers but failed to report for duty, pending completion of a formal removal process. Formal removal might also be required for persons who were given offers of employment but then failed to pass a required security clearance or other pre-employment investigation before entering on duty. They conclude that a system which operated in this manner would be unworkable and, as the Court noted above, create chaos. It may also create another problem in federal personnel management, namely, what was the beginning date for retirement or leave purposes if the Standard Form 50 or Form 52 were not regarded as the prerequisites for obtaining federal appointments. It also might mean, under *United States v. Testan, supra,* that benefits flowing from letters offering employment, if any, regardless of whether the offeree accepted the offer, would flow from the date of the issuance of the letters to the selectees, rather than from the date of entry on duty.

This case involves a judgment by the Office of Personnel Management in determining what action by agency officials creates an "appointment." The plaintiffs seek to substitute their judgment of what is an appointment, and, if the Court were to adopt it, it would be doing so without deference required by law, which must be afforded to an agency such as OPM and its interpretation. In the face of similar challenges, the Supreme Court has repeatedly stated:

> To sustain the commissions application of this statutory term, we need not find that its construction is the only reasonable one or that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.

*Unemployment Commission v. Aragon,* 329 U.S. 143, 153–54, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). *Mourning v. Family Publication Service,* 411 U.S. 356, 372–3, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318 (1972); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Udall v. Tallmen,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

It seems appropriate to refer again to the case of *Marbury v. Madison* where Marbury's commission had to have the seal of the United States affixed to it by the Secretary of State. The commission was delivered to Mr. Marbury. The Court held that since the Secretary of State was not the appointing official, his duties were merely ministerial. In this case, as the government appropriately points out, it is the appointing official himself who signs the Form 50, and his action is not ministerial since the Form 50, when signed, is the last act necessary to complete the appointment. Before that time, the appointing official may revoke offers which he or his subordinates had previously made, just as the President of the United States in *Marbury v. Madison,* could have withheld Marbury's appointment prior to the President's signing of the commission. It should be pointed out here that the plaintiffs are correct in asserting that "the regularity of governmental process must be presumed" and that this "would

mandate the assumption that those who communicated the employment commitments to the class members did so with authority." The conclusion to be drawn from this assumption is merely that those who communicated the employment offers had authority to select or nominate, not authority to appoint. Furthermore, a federal appointment to a federal job in an executive department or agency is not similar to a contract and the appointment only occurs when the last discretionary act is completed, at which time the government is then bound under traditional principles of law. Even if contract principles applied to the area of federal government employment, the letter offers here involved would be insufficient to create a contract, because it would require acceptance for them to be binding. Accordingly, whether the signatorees to the letters to the named plaintiffs or the members of their class had authority to make appointments or merely make offers of employment makes no difference, as it is well established and has been since the beginnings of this republic that the last discretionary act necessary for an appointment must be done before federal employment can be said to begin, and this includes the completion of a Form 50 or Form 52 and entry on duty by the appointee.

IV. THE PLAINTIFFS HAVE NOT BEEN DEPRIVED OF PROPERTY WITHOUT COMPENSATION OR DUE PROCESS OF LAW UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.

Contrary to the contention of the plaintiffs, the Fifth Amendment cannot serve as an independent basis for a liability in this case. The reason is that there is no constitutionally protected right to government employment. *Coleman v. Dardon*, 595 F.2d 533, 538 (10th Cir.), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). This is particularly true here because there can never be, to use the words of the plaintiffs, an entitlement to a federal job without an "appointment." As the Supreme Court has said in *Greenholtz v. In-*

*mates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979), to obtain a "constitutionally" protectable right, " 'a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' " To repeat, although the plaintiffs may have had a unilateral expectation of a job for which they applied, absent an "appointment", they possess no "legitimate claims of entitlement" to such jobs. As Judge Henry Friendly once said, "There is a human difference between losing what one has and not getting what one wants." Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267, 1296 (1974). The plaintiffs in this action are in the latter category described by Judge Friendly, as the defendants assert.

To put the proposition another way, the Supreme Court has also recognized in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), that "[p]roperty interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." 408 U.S. at 577, 92 S.Ct. at 2709. *See also Bishop v. Wood*, 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). In this case, it is federal, rather than state, law which is the "independent source" from which any relevant "rules or understandings" must stem. Because of the fact that federal law clearly provides that "orthodox federal employees . . . serve by appointment to a particular position, a legitimate claim of entitlement to federal employment can only arise after "appointment" has occurred. Were this not so, as defendants assert, the necessity of adherence to the detailed federal statutory and regulatory process governing federal employment could only be determined on an *ad hoc* basis, and federal employment and personnel activities would be thrown into havoc. It is fundamental that plaintiffs' expectations of appointment to positions with the

federal government cannot constitute legitimate claims of entitlement protectable as property under the Fifth Amendment. Even if this were not so and plaintiffs could somehow prove, absent appointment, that they had a legitimate claim of entitlement to federal employment, their Fifth Amendment claim would fail because they have already received the sole procedural due process protection which they seek, namely, to receive notice of termination containing the reason for the termination. 5 C.F.R. § 315.804. Here, they have been notified of the reason for their nonappointment to a federal job and their papers admitted such, and they have also been given the reason therefore, namely, the Presidential hiring freeze. In examining *Board of Regents v. Roth*, it is important to note what the Court actually held involving a university professor who was discharged. The Court noted that the professor had no property interest in continued employment when he had been hired only for a fixed term of one academic year, had no formal tenure, and could point to nothing in state law or in his employment contract which might otherwise explicitly or implicitly entitle him to contract renewal. This Circuit quoted *Board of Regents v. Roth* in *Colm v. Vance*, 567 F.2d 1125, 1128 (D.C.Cir.1977) and said that something more objectifiable than a sanguine expectation is necessary. Further, the Court in *Roth* said:

"to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation for it ... Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

408 U.S. at 577, 92 S.Ct. at 2709. Here, there was nothing more on the part of the plaintiffs than a unilateral expectation that they would get a federal job; they had no more; they had not been appointed to a job; they had no property interest in a federal job; there are and were no rules or understandings that secured to them any benefits other than that which they already received, namely a notice of the hiring freeze and that they were not being allowed to come to work by the virtue thereof. That is all that a probationary employee would have gotten, so it follows that plaintiffs were entitled to no more under express decisions of the Supreme Court of the United States. Moreover, the claimed property interest here does not rise to the dignity of those protected by the Constitution under the Fifth Amendment or otherwise.

The foregoing is supported by the opinions of this Circuit, where it held that "a legitimate claim of entitlement must derive from some reasonably identifiable source apart from the mere expectancy or desire of the claimant." *Colm v. Vance*, 567 F.2d 1125, 1128. *See Sims v. Fox*, 505 F.2d 857, 861–62 (5th Cir. 1974) (en banc), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975). In *Colm v. Vance*, Judge Tamm points out that "there is no such thing as a federal constitutional common law of property interests" and said that the Court of Appeals for this Circuit is "scarcely inclined to fashion one." A footnote points out that "conventional entitlement theory has not fared well in the periodical literature." *See* 567 F.2d at 1131, n.8.

For the plaintiffs to claim that they had an absolute entitlement to a benefit or job to which they were deprived cannot stand scrutiny, either under the Constitution or any other theory known to this Court. The government has correctly stated that the President's decision that a freeze on employment by federal agencies is in the public interest and should not be upset, absent the most extraordinary circumstances. No extraordinary circumstances are present here, nor were any vested rights created in the letters to the selectees who are the plaintiffs in the cases at bar or the class whom they represent.

For all of the foregoing reasons, the plaintiffs' claim to a due process right or

violation is invalid and cannot withstand the scrutiny under the facts in the case at bar.

## V. THE FEDERAL AGENCIES AND DEPARTMENTS HERE INVOLVED CANNOT BE ESTOPPED FROM DENYING PLAINTIFFS' CLAIMS TO THE JOBS SUBJECT TO THIS LITIGATION.

The doctrine of equitable estoppel generally cannot be invoked against the federal government. This is true even though, as previously stated herein, hardship to private parties might result in individual cases. *Lee v. Munroe and Thornton*, 11 U.S. (7 Cranch) 366, 3 L.Ed. 373 (1813). This principle, founded on the view that a contrary rule would make it "very difficult for the public to protect itself" (*id.* at 369–70), has been repeatedly and consistently observed. *See Hart v. United States*, 95 U.S. 316, 318–19, 24 L.Ed. 379 (1877); *Pine River Logging Company v. United States*, 186 U.S. 279, 291, 22 S.Ct. 920, 925, 46 L.Ed. 1164 (1902); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408–09 (1917).

The elements of estoppel have now been modified by the United States Court of Appeals for the Ninth Circuit in the light of the Supreme Court decision in *Immigration & Naturalization Service v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973). Here, the Court acknowledged that the government might be estopped for "affirmative misconduct." *See Santiago v. INS*, 526 F.2d 488 (9th Cir. 1975), *cert denied* 425 U.S. 971, 91 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Thus, in *United States v. Ruby Co.*, 588 F.2d 697 (9th Cir. 1978), after listing the "ordinary elements of estoppel," the Court held that:

> the formulation of the necessary elements of estoppel must be modified in the light of the affirmative misconduct limitation expressed in *Santiago*. As a result, the elements must be read as requiring an *affirmative misrepresentation* or *affirmative concealment* of material fact by the government. (Emphasis Added)

(588 F.2d at 703–04).

■ Accordingly, by requiring an affirmative misrepresentation or concealment of a material fact, the Ninth Circuit has brought the standards for equitable estoppel in line with the traditional standards which are listed by the opposition to plaintiff Trott's motion for class certification. It is also instructive to note the decision of the United States Court of Appeals for this Circuit in *Parker v. Sager*, 174 F.2d 657, 661 (D.C.Cir.1948). The Court in *Parker* set forth the applicable standards which are as follows:

> The essential elements of equitable estoppel as related to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which a party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such character as to change his position prejudicially.

174 F.2d at 661.

■ In the instant case, the government acted in good faith and did not misrepresent the true facts or attempt to conceal a material fact as was admitted at the hearing on February 25, 1981, in open court. *See* plaintiffs' Supplemental Memorandum at p. 22, which concedes that estoppel against the government will not lie "where the representations or promises are unauthorized." Therefore, one not lawfully possessed of delegated appointment authority to write a letter to a member of the plaintiffs' class could not thus bring about an estoppel against the government.

Last, whether the selection officials had appointment authority or not or were authorized to act on behalf of the government is not "affirmative misconduct" and, there being nothing else in the record to meet the elements of the doctrine of estoppel, it must fail as a valid basis for plaintiffs' claims in this case.

## VI. CONCLUSION

In light of the foregoing, the government's motion for summary judgment be, and the same hereby is, granted, and, the plaintiffs' motion for summary judgment be, and the same hereby is denied, in accordance with the Memorandum Opinion of the Court issued of even date herewith, and the case shall stand dismissed.

## APPENDIX
### EXHIBIT A

FOR IMMEDIATE RELEASE                              JANUARY 20, 1981

Office of the White House Press Secretary

---

### THE WHITE HOUSE

January 20, 198–

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS
AND AGENCIES

SUBJECT:          HIRING FREEZE

---

I am ordering today a strict freeze on the hiring of Federal civilian employees to be applied across the board in the executive branch.

This action is necessary because the national budget is out of control. Estimates of Federal spending for fiscal years 1981 and 1982 have—in a single year—increased by $100 billion.

Last July, during my campaign for the Presidency, I pledged that we would take this action as a first step towards controlling the growth and size of government and stopping the drain on the economy by the public sector.

Imposing a freeze now can eventually lead to a significant reduction in the size of the Federal work force. This begins the process of restoring our economic strength and returning the Nation to prosperity.

The Director of the Office of Management and Budget will issue detailed instructions concerning this freeze. I am delegating to him authority to grant exemptions in those rare and unusual circumstances where ex-emptions are necessary for the delivery of essential services.

I ask that in carrying out this directive you insure the smallest impact possible on those areas of your agencies' operations that vitally affect the public, such as the processing of social security claims and the payment of veterans and retirement benefits. You should seek efficient use of personnel and funds by making reallocations within your respective agencies to meet highest priority needs and to assure that essential services are not interrupted.

Obviously, contracting with firms and institutions outside the government to circumvent the intent of this directive must not be permitted.

This begins the process of revising and reducing the 1981 and 1982 budgets, a project that will occupy much of our time during the coming weeks and months.

This will be a demanding period for all of us; it is also a time of challenge and an unusual opportunity to serve our Nation well. I am relying upon you for strict implementation of this directive.

RONALD REAGAN

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

Bulletin No. 81–6                                                    January 24, 1981

TO THE HEADS OF EXECUTIVE DEPARTMENTS AND ESTABLISHMENTS

SUBJECT: Federal Civilian Hiring Freeze

1. Purpose. This Bulletin provides for an immediate and total freeze on the hiring of Federal civilian personnel as directed by the President on January 20, 1981. Instructions are also provided for appeals in a very limited number of situations where exceptions may be warranted.

2. Rescission. OMB Bulletin No. 80–7, dated March 17, 1980, is hereby rescinded, together with any exemptions granted under its provisions.

3. Authority and background. The Budget and Accounting Act of 1921, as amended. The President has directed that a total freeze be placed on the hiring of Federal civilian employees in the Executive Branch. This Bulletin outlines the steps that will be taken to carry out this directive.

4. Coverage. These instructions apply to all Executive Branch departments and establishments.

5. Policy. It is the policy of this Administration that the overall size of the Federal civilian workforce shall be reduced as expeditiously as possible. Toward that end, Executive Branch departments and establishments are directed to stop immediately all hiring.

Except for the exemptions listed below, this hiring limitation applies to all departments and establishments and to all types of appointments, temporary as well as permanent.

Contracting with firms and institutions outside the Government will not be used to alleviate or circumvent the effect of this hiring freeze.

6. Exemptions. The following exemptions to the hiring freeze are permitted:

a. upon determination by the agency head that hiring is necessitated by emergency situations involving directly the safety of human life or the protection of property. The determination must be based upon a clear indication that human safety could be affected directly or that property could be damaged. Such a determination may be applied in situations where medical, hospital, or other health care is furnished directly and where protection of property or persons is the primary purpose of employment. Air safety functions are also included. This exception does not apply to employment involving research, or other activities that ultimately affect human safety. It also does not apply to employment for maintenance of facilities or land and forest management.

An agency head who determines that this exemption is applicable must immediately notify the Director of OMB in writing that the exemption is being used and state the reasons therefor as well as the number of positions involved. The Director of OMB may overturn the exemption, if, in his view, it is not warranted.

b. the filling of positions under programs that are presently exempt from employment ceilings.

c. hiring in accordance with firm written commitments made on or before November 5, 1980, by agency personnel officers.

d. hiring by the U.S. Postal Service.

e. reassignments of personnel within an agency.

f. appointments to Executive Level positions and noncareer appointments in the Senior Executive Service.

g. appointments to Schedule C positions. In filling these positions, the number of such appointments may not exceed the number of Schedule C positions existing in each agency as of November 5, 1980.

h. shifting of employees from one agency to another because of a transfer of functions resulting from Presidential reorganization or legislative action.

i. hiring by Executive Branch agencies whose on-board total employment as of December 31, 1980, was less than 100. (Hiring by such agencies will not exceed the number of vacancies that occur after December 31, 1980.)

j. seasonal hiring of temporary employees consistent with historical hiring patterns may be continued, provided that the agency informs OMB in writing in advance of its hiring plans. Such hiring of temporary employees may not be used as a means to circumvent this Bulletin.

k. to facilitate the transition, a limited number of noncareer positions may be established for up to 120 days.

l. hiring for positions in the Executive Office of the President that are necessary for an orderly transition and operation of the new Administration.

7. _Appeals._ Additional exemptions may be granted in a very limited number of cases if a determination is made by the Director of the Office of Management and Budget that such action is necessary to assure that essential services are provided, fundamental needs are met, and applicable provisions of law are carried out. When an agency head believes that circumstances warrant an exemption, other than those automatically permitted under section 6 of this Bulletin, an appeal must be made by letter, addressed to the Director of the Office of Management and Budget and signed by the agency head. The need for additional personnel must be fully justified, including an explanation as to why reallocation within the agency is not feasible.

8. _Use of savings._ Dollar savings generated from personnel reductions may be applied to other approved program activities within the same appropriation in the following order of priority:

a. to offset the need for mandatory program supplemental appropriations or amendments that could otherwise be submitted to the Congress under the provisions of the Antideficiency Act (31 U.S.C. 665(e)).

b. to reduce the 1981 pay supplemental transmitted with the 1982 Budget.

However, where personnel reductions result in withholding of appropriations from obligation, the reporting requirements prescribed by the Impoundment Control Act of 1974 apply, as set forth in OMB Circular No. A–34 and OMB Bulletin No. 75–15. In such cases, rescission proposals or deferral reports will be prepared and submitted to OMB for inclusion in a special message on rescissions and deferrals.

9. _Revised 1982 Budget._ The personnel reduction will be a part of the Administration's revised 1982 Budget. Further instructions will be provided in a later bulletin that will address budget revision procedures.

10. _Effective dates._ The instructions in this Bulletin are effective immediately and will remain in effect until further notice.

11. _Inquiries._ Questions regarding the instructions in this Bulletin will be addressed to the OMB representatives in charge of the agency's budget estimates.

/s/ Dale R. McOmber
Dale R. McOmber
Acting Director

EXECUTIVE OFFICE OF THE
PRESIDENT

OFFICE OF MANAGEMENT
AND BUDGET

WASHINGTON, D.C. 20503

January 29, 1981

Filed Feb. 9, 1981

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

SUBJECT: Federal Civilian Hiring Freeze

OMB Bulletin 81-6 provides the details on the hiring freeze ordered by President Reagan on January 20, 1981. Paragraph 6c of that bulletin provides that new hiring after January 20, 1981, could take place only if a firm written commitment had been made by an agency personnel officer prior to November 5, 1980.

Some agencies have indicated informally that this particular provision could cause serious hardship to some prospective employees. This memorandum provides guidance for such circumstances.

First, agency heads must recognize that the freeze is made necessary by a situation demanding sacrifices to help in bringing under control immediately the size and cost of government.

Second, agency heads are to review cases carefully and forward to OMB for consideration for exemption as potentially presenting a severe hardship, only those limited cases that meet all of the following conditions.

—a definite, written offer of employment must have been made by a duly authorized personnel officer between November 5, 1980 and January 20, 1981;

—not being hired will result in demonstrable, severe and irreparable financial loss (the financial condition of the candidate and the nature of the prospective job and salary should be taken into account in assessing severity of the financial loss);

—the individual involved was prudent in his or her actions (for example, in terms of timing of severing other employment; or taking on new financial commitments in anticipation of a new job);

—the actions of the agency and the individual were prudent in light of general public knowledge that a freeze would be applied; and

—except for the hiring freeze, the prospective employee would have been employed in the position offered.

The agency head must be satisfied that each of the above conditions is met before making a request to this Office.

Third, if requests are to be submitted, they are to be consolidated into a single submission signed by the agency head. The submission is to provide the following information on each case:

—Name of prospective employee;

—Position, grade and nature (temporary, career-conditional, etc.) of prospective appointment;

—Organizational designation and location of prospective work place (do not use acronyms below the agency level);

—Name, title, and office telephone number of personnel officer who signed the commitment letter;

—Name, title, and office telephone number of person who directed that the commitment letter be issued;

—Any other pertinent information relating to the job offer (e. g., in accord with the one-for-two hiring limitation); and

—Circumstances leading to the view that a serious hardship exists under the conditions outlined above.

/s/ David A. Stockman

David A. Stockman
Director