Yolanda A. JOHNSON and Patricia L. Medina, Individually, and on Behalf of All Those Similarly Situated, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CIV.A.SA–99–CA–1357–FB.

United States District Court,
W.D. Texas,
San Antonio Division.

Aug. 28, 2001.

Franklin D. Houser, San Antonio, TX, Jerry Galow, Phillip H. Schmandt, Watson, Bishop, London & Galow, Austin, TX, Daniel W. Bishop, II, Watson, Bishop, London & Golow, Austin, TX, Larry R. Daves, Colorado Legal Services, La Junta, CO, Woodrow M. Roark, Tyler, TX, Armando Lopez, Armando Lopez, P.C., Houston, TX, Rondaline Craft, Tinsman & Houser, Inc., San Antonio, TX, for plaintiffs.

Winstanley F. Luke, Assistant U.S. Attorney, Harold E. Brown, Jr., Assistant U.S. Attorney, Britannia Hobbs, United States Attorney, Western District of Texas, San Antonio, TX, for defendant.

### *ORDER CONCERNING JURISDICTION AND MOTIONS FOR CLASS ACTION CERTIFICATION AND MOTIONS TO TRANSFER CASE TO COURT OF FEDERAL CLAIMS*

BIERY, District Judge.

#### *The Past as Prologue*

In a perfect world, members of the human species would live together in peace, and in Eden-like harmony with the earth which bore us. It is not a perfect world.

The dispute before the Court has its genesis in these words:

"We will bury you." [1]

"Think what a better world it would be if. . . . all governments had as a basic policy to always . . . clean up their own mess." [2]

The period 1945 to 1990 became known as the Cold War.[3] The United States became

---

1. Attributed to Nikita Khrushchev, First Secretary of the Soviet Union Communist Party, 1953–

the chief military power to preserve certain values from threats, real and imagined. American taxpayers paid for a massive build-up of bullets, bombers and bases to support the war effort. American families sent their sons and daughters to serve. For those who lost limbs or lives, compensation was provided by spreading the cost through our social contract that those who bear the burdens of

defense should not be left to suffer the loss alone.

■ The Fifth Amendment to the United States Constitution prohibits taking of property without reasonable compensation. This concept has its historical roots in our revolt against the colonial practice of confiscating private property for public purposes without compensation.[4] The Third Amendment, as

1964. According to one version, that phrase was used when the Soviet Premier admonished the United States in a famous shoe-pounding speech at the United Nations. However, as Khrushchev's son later confirmed, his father had "referred to economic and not thermonuclear burial. But the distinction was often lost in fear and outrage on the American side of the Iron Curtain." Francis X. Clines, *Sergei Khrushchev, American, Will Completely Bury the Hatchet*, N.Y. TIMES, July 11, 1999, *available at* http:// archives.seattletimes.nwsource.com/ cgi-bin/texis. cgi/web/vortex/display? slug=khru & date=19990711. In fact, when the Soviet Premier was interviewed in Pittsburgh, he acknowledged that his statement referred to an economic competition rather than a war and that "he loved the United States and had no intention of going to war with it." Virginia Peden, *Former Newspaper Reporter Looks Back on a Lifetime of Stories*, PITTSBURGH POST-GAZETTE, June 25, 1997, at S14, *available at* 1997 WL 11828362. Another version provides the following story:

In 1956, the former Soviet leader was telling a gathering of Eastern Bloc diplomats in Moscow not to worry if they were shunned by the West, that history was on the side of socialism. Then, [Raphael] Baron [of Polyglot International] said, Khrushchev, who had a penchant for Russian peasant idiom, used a phrase that was literally translated as: "We will show you Kuzka's mother." To Russians, the phrase connoted a relentless shrew who would never let up until she was vindicated. But in the heat of the moment, Khrushchev's translator rendered the phrase as: "We will bury you." "That translation probably drove 4 or 5 trillion dollars in defense spending on both sides," said Baron's partner, Holger Reiter.

*Business Can Get Lost in Translation*, CHARLESTON GAZETTE, May 28, 1995, at P6B, *available at* 1995 WL 11608777.

2. ROBERT FULGHUM, ALL I REALLY NEED TO KNOW I LEARNED IN KINDERGARTEN 7–8 (Villard Books 1989).

3. Some believe the Cold War ended with the fall of the Berlin Wall in 1989 while others find the Cold War was over on December 21, 1991, when the Soviet Union ceased to exist. *Compare* The Cold War 1945–1989 *available at* http:// www. campus.northpark.edu/history/WebChron/

USA/ColdWarEra.html (1989 Cold War Ends) *with* Russia.Net—History: The Coup of August 1991, The Collapse of the Soviet Union *available at* http://www.russia.net/~oldrn/history/coup.html (Soviet Union ceased to exist on December 21, 1991).

4. "The principle that the state necessarily owes compensation when it takes private property was not generally accepted in either colonial or revolutionary America." William Michael Treanor, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 YALE L.J. 694 (1985). Private property was regularly taken without compensating the owner in eighteenth-century colonial legislatures. In instances where the owner failed to develop the property, ownership was just transferred to another. The taking of private land without compensation was usually done for the purposes of building public roads. *Id.* at 695. James Madison, the author of the just compensation clause of the Fifth Amendment, had championed the interest of property owners during his legislative career in Virginia. *Id.* at 709. Madison's reasons for his proposal of the just compensation clause has been explained as follows:

First, the clause would explicitly bar the uncompensated taking by the national government of chattel and real property; this bar was the same one that had earlier been imposed in Vermont, Massachusetts, and the Northwest Territories....Madison seems to have taken a rather limited view of what legal rights such a clause created: He intended the clause to apply only to direct, physical taking of property by the federal government.
. . . .
On a second level, though, Madison saw the clause as serving a broader purpose. He hoped that it would have a far-reaching educative function. The "paper barrier[]" would—as a statement of national intent—impress on the people the sanctity of property. It would thus curb the popular desire to enact laws favoring debtors, imposing unequal taxes, or producing cheap money in order to undermine the position of creditors.

Madison's éssay Property, written shortly after the ratification of the Bill of Rights, supports this reading of his intentions. He argues on

first cousin to the Fifth, was a reaction to the British custom of using private homes for military purposes of quartering soldiers.[5] In addition to the Fifth Amendment, plaintiffs implicitly invoke Fehrenbach's Fifth Law: Solving Problems Creates More Problems.[6] We won the Cold War, but we may have poisoned our water in the process. Perhaps Pogo was correct in his observation that "We have met the enemy and he is us." [7] But he may not have recognized that Mother Nature will bat last.

Plaintiffs represent a proposed class of over 10,000 families owning modest $30,000 to $50,000 homes in a working class neighborhood surrounding defendant's military facility, Kelly Air Force Base. Plaintiffs essentially contend the defendant United States of America, while doing its best in the military defense of its citizens, nevertheless quartered its chemicals on plaintiffs' properties without permission or reasonable compensation, leaving a toxic footprint on the earth. The United States answers that it lived as lightly as possible on the land in question and exhibited proper stewardship, according to the standards applicable at the time.

Plaintiffs seek monetary damages for alleged diminution of the value of their real property and, in effect, wish to be compensated similarly to those who suffered physical injuries as a result of military service. The defendant United States of America contends it has no legal liability and that the properties in question continue to sell at the same values as other similar properties outside of the allegedly toxically tainted terrain.

In addition to claiming no legal liability, defendant also opposes class certification in this Court. Defendant contends plaintiffs can seek redress of their perceived grievances and their day in court only by filing multi-plaintiff or individual lawsuits in San Antonio, Texas, for relatively small amounts of damages, or as a class by legally traveling to Washington, D.C. and the United States Court of Federal Claims. Defendant initially raised jurisdiction and venue issues before this Court to which plaintiffs have responded by narrowing the scope of the proposed class.

two levels for the "inviolability" of property, beginning on the level of legal requirements. Because of the Fifth Amendment, he indicated, the federal government was committed to observe the proposition that "no land or merchandize" "shall be taken directly even for public use without indemnification to the owner." Madison then moved from legal to moral argument. The requirement of just compensation evidenced "pride[]...in maintaining the inviolability of property." Consistency with that underlying purpose required observance of a wide range of personal and property rights. A government that provided compensation when it took real or personal property demonstrated its commitment to personal freedom; it would dishonor that commitment if it were to directly violate[] the property which individuals have in their opinions, their religion, their persons, and their faculties...[or] indirectly violate[] their property, in their actual possessions, in the labor that acquires their daily subsistence, and in the hallowed remnant of time which ought to relieve their fatigues and soothe their cares. *Id.* at 710–12 (citations and footnotes omitted).

5. The Third Amendment has its historical origin in the English Bill of Rights of 1689. *Engblom v. Carey*, 677 F.2d 957, 966 (2d Cir.1982) (Kaufman, J., concurring & dissenting). This Amendment "embodies a fundamental value the Founders of our Republic sought to insure after casting off the yoke of colonial rule: the sanctity of the home from oppressive governmental intrusion." *Id.* at 966–67. Pursuant to the Quartering Act of 1765, "the British Parliament required the American colonists to bear the cost of feeding and sheltering British troops stationed in this country." *Id.* at 967. The actual language of The Quartering Act, British Parliament—1765 provided, in part, as follows:

And be it further enacted by the authority aforesaid, That if any...person whatsoever...within his Majesty's said dominions in America, shall neglect or refuse...to quarter or billet such officers or soldiers...in such manner as is by this act directed...shall be thereof convicted before one of the magistrates of any one of the supreme chief or principal common law courts of the colony where such offence shall be committed...person so offending shall forfeit, for every such offence, the sum of five pounds sterling.

The Quartering Act, America's Homepage, Historic Documents of the United States, *http://ahp.gatech.edu/quartering act 1765.html* (last visited May 24, 2002).

6. T.R. Fehrenbach, Author and Historian.

7. "Pogo" was Walt Kelly's most famous creation, and Pogo's most famous phrase was, "[w]e have met the enemy and he is us," which was a "rallying cry for a generation of conservationists." *Walt Kelly*, Bud Plant Illus Books, *available at http://www.bpib.com/kelly.htm.*

Although the Court understands plaintiffs' desire to litigate this matter as a class in a San Antonio federal court, the jurisdictional and venue constraints imposed by Congress require plaintiffs to continue either as a group of individual plaintiffs in this Court or as a class in the Court of Federal Claims. For the reasons stated below, the Court declines the invitation to limit homeowners not presently before the Court to $10,000 in damages without the homeowner expressly consenting to such limitation. Accordingly, class certification is denied.

### Procedural Posture

A case of apparent first impression presents a motion for class action certification seeking certification of a class of current property owners whose properties allegedly have been invaded and occupied by toxic chemicals and other pollutants released from Kelly Air Force Base by defendant United States of America. As originally filed, the motion sought to certify a class with the following definition:

> All current property owners who owned their property on or before July 1, 1995, and whose property lies within the pollution plumes identified by the United States Air Force, as depicted on the Air Force's plume maps dated July 7, 1999 and May–June 1997 and attached hereto as Exhibit "A" and "B."

Plaintiff's Motion for Class Action Certification (docket # 16). In response to this motion, defendant argued the class certification must be denied or the action transferred to the Court of Federal Claims because plaintiffs' class designation extends to claims in excess of $10,000 over which this Court lacks subject matter jurisdiction under the Little Tucker Act,[8] and venue is not proper under the Little Tucker Act because the proposed class contains plaintiffs who reside outside of this district.

8. 28 U.S.C. § 1346(a)(2).

9. *Bywaters v. United States*, 196 F.R.D. 458 (E.D.Tex.2000); *Schneider v. United States*, 197 F.R.D. 397 (D.Neb.2000).

10. At the conference held in this case on May 16, 2001, defendant noted an appeal on venue requires permission from the court, mandamus or

The Court initially heard arguments of counsel on July 13, 2000. On January 26, 2001, the Court issued an order requesting further briefing on the issue of class certification based on two recent opinions discussing class certification in the context of a Fifth Amendment takings claim brought pursuant to the Little Tucker Act,[9] although not involving toxic taking theories. In both cases, the United States received adverse rulings and chose not to appeal.[10] Once the additional briefing was submitted, defendant requested a status conference and oral argument to discuss further the issues before the Court. That conference was held on May 16, 2001. Following the conference, the defendant filed its Motion to Transfer Pursuant to 28 U.S.C. § 1631 and Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404.

In addition to responding to defendant's motions to transfer, plaintiffs sought and were granted leave to file an amended pleading and amended motion for class certification. The amended motion for class action certification redefined the proposed class as follows:

> All current property owners of single family residential property who reside in the Western District of Texas, and who owned their property on or before July 1, 1995, or sold their property on or after July 1, 1995 and disclosed the presence of contamination on the property to the buyer, and whose total claims are $10,000 or less and whose property lies within the pollution plume, as identified by the United States Air Force shown on Exhibit "A" (Landata composite plume map).

Plaintiffs' First Amended Motion for Class Action Certification (docket # 57). Plaintiffs assert certification of a class is appropriate under both rule 23(b)(1) and 23(b)(3) of the Federal Rules of Civil Procedure. In re-

waiting until the end of the case. Defendant speculated that "main justice" in the *Bywaters* case may not have seen it "worthwhile to appeal." Defendant also stated, with respect to the venue issue here, there is no interlocutory appeal unless this Court were to favorably entertain a motion by the government to certify that question.

sponse, defendant maintains the amended motion must also fail because (1) this Court lacks jurisdiction over the prospective class because the prospective class members' claims exceed $10,000, the jurisdictional maximum of this Court under the Little Tucker Act; and (2) the antagonism in the class the plaintiffs seek to certify. Defendant also filed a motion for recusal because some court staff or their families may be potential claimants. Plaintiffs oppose this motion as well.

## Background

Plaintiffs' first amended complaint alleges the defendant, United States of America, operates Kelly Air Force Base in San Antonio (Kelly), and in operating the base has a long history of chemical releases, dumping, and toxic leaching resulting from aircraft maintenance and industrial operations. In particular, plaintiffs say defendant's operations left behind residual trichloroethylene (TCE), dichlororethylene (DCE), perchloroethylene (PCE), benzene, vinyl chloride, heavy metals, and other hazardous wastes in the soils and water table in and around Kelly. Over the years, the toxins have migrated into the groundwater and into the urban areas surrounding Kelly where plaintiffs' homes are located. Plaintiffs claim the entry of the chemicals and other dangerous substances onto and beneath their real property has resulted in an invasion of their property by the United States and constitutes a taking of their property. Plaintiffs seek all damages permitted under the Little Tucker Act as just compensation for the taking of the property by the diminution in the value of their property and/or the cost to clean up the contamination.

According to information provided by defendant, the Air Force began to study extensively the alleged pollution from Kelly in early 1982. One of the studies investigated the shallow groundwater in and around Kelly to determine the nature and appropriate re-
sponse to the alleged pollution problem. This particular inquiry found the groundwater in the area east, south, and north of Kelly has been contaminated by chlorinated solvents from sources both on and off Kelly. The groundwater is not used for drinking water and is unfit for drinking because of high levels of nitrogen unrelated to Kelly and caused by fertilizers and sewer leakage. The study also found some of the areas within the pollution plumes are "dry zones" meaning there is no shallow water below them while some areas have "trapped" groundwater which is water not within existing groundwater flows. The study concluded the dry zones and the trapped groundwater cannot be contaminated by Kelly. In addition to the dry zones and trapped groundwater, the study also found that within some of the plume areas, the groundwater advances and retreats. Therefore, there are times when the groundwater is present under the property and times it is not. The study also noted all properties within the plume area have municipal water service because of the unreliability of the groundwater.

After the initial studies, the determination was made some of the areas needed remediation and there also was a need for further characterization of the soils and groundwater. According to defendant, the clean up efforts divided the Air Force property into five zones.[11] All zones have efforts underway to implement cleanup, and four of the five zones have procedures in place to realize that goal. Defendant contends the property values have not been adversely impacted by the presence of the pollution plume or the closure of Kelly, but these issues on the merits are not presently before the Court.

## Subject Matter Jurisdiction and Venue

■ As originally filed, venue was in issue because all of the prospective plaintiffs did not reside in the Western District of Texas. Plaintiffs in response to defendant's argu-

11. Kelly Cleanup Zone 1 is located on the western end of the Base and represents the geographic area associated with Kelly's golf course; Zone 2 represents the geographical area associated with the southern most part of Kelly along Leon Creek, and is an area that housed the jet engine test cells and the Environmental Process Control Facility; Zone 3 is located in the southeastern portion of the base and encompasses the industrial area; Zone 4 includes the area known as East Kelly which is a part of Kelly geographically separated from main Kelly, and Zone 5 covers approximately 2600 acres in the central portion of the base.

ment have amended their complaint and proposed class definition to satisfy the venue requirements of the Little Tucker Act. As a result, the venue issue is now moot.[12]

■ With respect to subject matter jurisdiction, plaintiffs filed their claim under the Fifth Amendment of the United States Constitution to receive compensation for the alleged invasion and taking of their property by contaminants released from Kelly. With its antecedents in colonial America, the Fifth Amendment prohibits the taking of private property for public use, "without just compensation." *Preseault v. I.C.C.*, 494 U.S. 1, 11, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). As the Supreme Court explained:

> The Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." It is designed "not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." Furthermore, the Fifth Amendment does not require that just compensation be paid in advance of or even contemporaneously with the taking. All that is required is the existence of a " 'reasonable, certain and adequate provision for obtaining compensation' " at the time of the taking. "If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compen-

sation,' then the property owner 'has no claim against the Government' for a taking."

For this reason, "taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." The Tucker Act provides jurisdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract. *See* 28 U.S.C. § 1491(a)(1) (1982 ed.); *see also* § 1346(a)(2) (Little Tucker Act, which creates concurrent jurisdiction in the district courts for such claims not exceeding $10,000 in amount). "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [Claims Court] to hear and determine." *Id.* at 11–12, 110 S.Ct. 914 (case citations omitted). Basing jurisdiction on the Little Tucker Act, plaintiffs seek just compensation for the diminution in the value of their property by a reduction in value and/or the cost to clean-up the contamination. In their First Amended Complaint, plaintiffs "seek all damages permitted under the Little Tucker Act and none other." [13]

■ For purposes of assessing Little Tucker Act jurisdiction, the parties agree the amount of a claim "is based on the actual recovery sought by a plaintiff pursuant to

---

**12.** The venue provision of the Little Tucker Act provides that "[a]ny civil action in a district court against the United States under subsection (a) of section 1346 of this title may be prosecuted only: (1) Except as provided in paragraph (2), in the judicial district where the plaintiff resides." 28 U.S.C. § 1402(a). Because the class definition originally included property owners residing outside the Western District of Texas, defendant argued venue was improper. Plaintiff argued venue was proper because all the named plaintiffs as well as all of the property at issue was located within the Western District of Texas. In *Bywaters v. United States*, 196 F.R.D. 458, 464 (E.D.Tex.2000), the court found venue was proper because all of the class representatives resided within the District and there was no justification for excluding from the class the property owners who did not reside in the District because these plaintiffs may not even be required to appear and to so exclude would "defeat rather than advance the convenience and appearance-oriented purposes of venue." *Id.* Despite this holding, the

plaintiffs decided to amend their class definition to include only those plaintiffs who reside within the Western District of Texas.

**13.** In their prayer for relief plaintiffs request the following: (1) "judgment for Plaintiffs against the United States in the sum necessary to provide just compensation to Plaintiffs in accordance with the Little Tucker Act"; (2) "interest at the lawful rate from the date of the taking of an interest in Plaintiffs' property until the judgement is paid, not to exceed damages allowable under the Little Tucker Act"; (3) "costs and attorneys' fees recoverable under provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Title 42, § 4654(c), of the United States Code, not to exceed damages allowable under the Little Tucker Act," and (4) "such other and further relief as the Court deems proper, not to exceed damages allowable under the Little Tucker Act."

that claim and is not based on the potential worth of the claim." *Smith v. Orr*, 855 F.2d 1544, 1553 (Fed.Cir.1988). Plaintiffs assert their complaint and the proposed class definition limit the amount of recovery sought to $10,000 for each property. Moreover, plaintiffs point to the current state of damages testimony which they claim leads one to conclude the actual damages are less than $10,000 because the average diminution in value of the plaintiffs' property has been estimated to be between $7,715 and $9,644. In their response to Defendant's Motion to Transfer filed May 25, 2001 (docket # 53), plaintiffs also state, "[a]ttorneys' fees are not provided for by contract or statute, and therefore must be paid out of the Plaintiffs' recovery" citing *United States v. Bodcaw Co.*, 440 U.S. 202, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979). Plaintiffs maintain they are "seeking to recover no more than $10,000, inclusive of attorney fees, prejudgment interest, and all other recoverable costs."

Although there is no dispute a plaintiff with a claim in excess of $10,000 may waive any recovery in excess of $10,000 and thereby give this Court subject matter jurisdiction, defendant contends plaintiffs may not waive the claims of absent prospective class members in order to achieve the same result. Defendant maintains that plaintiffs seek to use the class certification mechanism of rule 23 to expand this Court's Little Tucker Act jurisdiction to claims over which it ordinarily would not have subject matter jurisdiction. If the Court certifies the class as defined, it would be finding, in effect, that plaintiffs' affirmative waiver binds the absent class members with the class notice being the vehicle by which class members would either ratify the waiver by remaining in the class or reject the waiver by opting out of the class. This procedure, according to the defendant,

violates rule 82 of the Federal Rules of Civil Procedure which provides that the "rules shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein." Thus, before rule 23 can be applied, this Court must have subject matter jurisdiction. Defendant maintains this Court lacks the jurisdictional power to effectively impose such a waiver and limitation of damages on prospective claimants.

Defendant contends the facts demonstrate plaintiffs' claims as well as the class members' claims exceed $10,000 because in an inverse condemnation case, a claim includes the diminution in value, interest on the value of the property interest allegedly taken, attorney's fees, and other expenses. As for the diminution in value, defendant points to the administrative claims previously filed by the plaintiffs as evidence that the property losses plaintiffs claimed to have suffered as a result of the alleged inverse condemnation due to contamination are in excess of $10,000.[14] Although in later briefing plaintiffs contend the diminution in value ranges from $7,715 to $9,655 based on expert reports, defendant challenges this evidence because the genuineness of these reports have not been established through affidavit, declaration or other means, and plaintiffs have failed to establish the foundation for admissibility by affidavit or declaration pursuant to the rules of evidence. However, even if the lesser value ranges are used, when interest from the alleged date of taking through June 30, 2001 is applied, the claims increase to between $10,715 and $13,395 respectively. In addition, plaintiffs seek attorney's fees and expenses which are provided for in an inverse condemnation proceeding despite plaintiffs' assertions to the contrary.[15] Based on plain-

14. Defendant relies on plaintiffs' good faith assertion in their administrative claims their property value diminished in value to zero as compelling evidence the absent class members may possess claims of similar value.

15. Defendant takes issue with plaintiffs' reliance on *United States v. Bodcaw, Co.*, 440 U.S. 202, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979), in support of their proposition that attorneys' fees are not provided for by contract or statute and therefore must be paid out of the plaintiffs' recovery. De-

fendant explains that although the Supreme Court pointed out that attorneys' fees and expenses are not provided for in condemnation actions governed by 42 U.S.C. § 4654(a), which was the situation in *Bodcaw*, the Court also noted the result in an inverse condemnation is different because that action is governed by 42 U.S.C. § 4654(c) which specifically provides for the recovery of attorneys' fees and expenses. Accordingly, defendant maintains attorneys' fees and costs should be considered in the valuation of the inverse condemnation claims in issue here.

tiffs' contingent fee agreement with their attorneys at this juncture, defendant estimates the attorneys fee will range from $2,679 to $3,349 thereby raising the value of plaintiffs' claims to between $13,394 and $16,744. This amount will be further increased by recovery of costs as provided for in 42 U.S.C. § 4654(c). Based on these calculations, defendant maintains it has convincingly demonstrated that the claims of the plaintiffs as well as the prospective class members are beyond the jurisdiction of this Court, and this Court may only exercise jurisdiction through an affirmative waiver by each property owner.

In response to this demonstration, plaintiffs remind the Court they are masters of their own claims, and they have by definition limited all claims to $10,000 or less despite defendant's allegations their claims are "really" over $10,000. As previously mentioned, jurisdiction under the Little Tucker Act is based on the actual recovery sought and not the "potential worth of the claim." *Smith v. Orr*, 855 F.2d 1544, 1553 (Fed.Cir.1988). However, this Court notes that *Smith* did not involve a class action or a waiver by the class representatives.[16] Plaintiffs explain the prospective class members are protected because they may simply opt out of the lawsuit should they not wish to waive their claims in excess of the $10,000 jurisdictional limit. Plaintiffs argue they have expressly limited their recovery to $10,000 including attorneys fees and prejudgment interest, and the defendant should not be allowed to redefine the issues to oust this Court of jurisdiction. Plaintiffs believe, based on the deposition of Douglas Stoddard, that the average plaintiff has suffered a loss in value of $6,300. Therefore, the vast majority of prospective class claims will not exceed $10,000, and for those that do exceed that amount, they may choose to waive any additional recovery in order to gain the benefit of the cost savings of expenses and attorney's fees which will be split with the other 16,000 class members.

Based on the foregoing discussion, the Court must first determine whether the class representatives may limit and waive the claims of absent prospective class members or if each class member must individually file a waiver of claims in excess of $10,000 in order for this Court to have jurisdiction. Although defendant argues the statute impliedly requires the waiver, there appears to be no authority directly on point in support of the proposition.[17] Likewise, plaintiffs have

---

**16.** In discussing the back pay claim, the Court provided the following analysis:

> It is clear from the language of the Little Tucker Act that the district courts are without jurisdiction over a nontax claim against the United States on which claim plaintiff's request for recovery exceeds $10,000. Such an action is proper only in the Claims Court. The Tucker Act operates as a waiver of sovereignty by the United States and we are obliged to construe such waivers strictly. Accordingly, we concur in the positions taken by the Third Circuit in *Chabal v. Reagan*, the Eighth Circuit in *Shaw v. Gwatney*, and the District of Columbia Circuit in *Goble v. Marsh* and hold that, within the ambit of section 1346(a)(2), the amount of a claim against the United States for back pay is the total amount of back pay the plaintiff stands ultimately to recover in the suit and is not the amount of back pay accrued at the time the claim is filed. Any other interpretation would circumvent congressional intent in limiting the Tucker Act jurisdiction of the district courts to claims not exceeding $10,000. Our holding does not preclude a plaintiff from bringing in a district court a claim against the United States worth more than $10,000. Rather, our holding is entirely consistent with the well-established principle that a plaintiff may pursue such a claim in a district court if the plaintiff waives his right to recover the amount exceeding $10,000. The amount of a claim under the Little Tucker Act, for jurisdictional purposes, is based on the actual recovery sought by a plaintiff pursuant to that claim and is not based on the potential worth of the claim.
>
> Here, Captain Smith filed a claim with the district court for back pay. Although at the time he filed his complaint the accrued amount of his claim did not exceed $10,000, Captain Smith's claim for back pay did accrue to greater than $10,000 during the district court's consideration of his claim. Because Captain Smith did not waive his right to recover the amount exceeding $10,000, the district court lost jurisdiction over his claim when it exceeded this amount.

*Smith v. Orr*, 855 F.2d 1544, 1552–53 (D.C.Cir. 1988) (footnotes omitted).

**17.** 28 U.S.C. § 1346(a)(2) provides:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of: [a]ny other civil action or claim against the United States not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or

cited several cases which in dicta appear to support their contention a waiver can be made on behalf of the absent class members and class members who wish to pursue a claim in excess of $10,000 may have their claims transferred to the Federal Court of Claims without destroying the jurisdiction of this Court over the class. Defendant argues those cases were wrongly decided and inappropriately argued.

■ As early as 1889, the courts recognized that for purposes of the Tucker Act, a litigant could remain within the jurisdiction of the regular federal courts even if his or her claim was worth more than $10,000 provided the litigant "voluntarily waived his right to recover more than $10,000." *Stone v. United States,* 683 F.2d 449, 451 (D.C.Cir. 1982); *see Hill v. United States,* 40 F. 441, 442–43 (C.C.D.Mass.1889) (court had jurisdiction to hear and determine case because plaintiff limited claim to $10,000 in his petition and "expressly waived all right to recover a larger sum"). These waivers, at least with respect to individual plaintiffs, are well established in the context of Tucker Act cases. *Stone,* 683 F.2d at 451. However, this Court has not found any decisions addressing the jurisdiction issue based upon the class representatives' waiver of damages beyond the $10,000 limit when defendant has presented evidence that the average claims exceed that amount.

In their initial briefing supporting class certification, plaintiffs cited three cases in support of their assertion that individual waivers are not necessary from each absent class member. *Saraco v. Hallett,* 831 F.Supp. 1154 (E.D.Pa.1993), *aff'd,* 61 F.3d 863 (Fed.Cir.1995), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996); *National Treasury Employees Union v. Reagan,* 509 F.Supp. 1337, 1342–43 (D.D.C. 1981); *Kizas v. Webster,* 492 F.Supp. 1135,

1156 (D.D.C.1980), *aff'd,* 707 F.2d 524 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Plaintiffs in later briefing acknowledge defendant's waiver concern for the unnamed class members but contend these individuals will be protected by simply allowing them to opt out of the lawsuit. In further support of their waiver and opting-out theories, plaintiffs rely on *Bywaters v. United States,* 196 F.R.D. 458 (E.D.Tex.2000); *Quebe v. Ford Motor Co.,* 908 F.Supp. 446 (W.D.Tex.1995); *Seroyer v. Pfizer, Inc.,* 991 F.Supp. 1308 (M.D.Ala.1997), and *Brooks v. Weinberger,* 637 F.Supp. 22 (D.D.C.1986).

■ In *Saraco,* employees of the United States Customs Service brought a class action against their employer for violating the Fair Labor Standards Act. The class sought overtime pay, liquidated damages, and declaratory relief. The defendant Customs Service moved to dismiss the case or in the alternative to transfer the claim for money damages to the Court of Federal Claims. The court recognized to the "extent plaintiffs' FLSA claims exceed $10,000, such claims are within the exclusive jurisdiction of the Court of Federal Claims and must be transferred to that court." *Saraco,* 831 F.Supp. at 1159. The court also recognized it had concurrent jurisdiction with the Court of Federal Claims for any of the "plaintiffs claims that do not exceed $10,000" under the Little Tucker Act. *Id.* Although waiver of each individual claim was not discussed directly, the court acknowledged that it ordinarily would grant plaintiffs leave to file an amended complaint in order to "waive their right to recover in excess of $10,000 and bring their claims within the scope of the Little Tucker Act," but such leave to amend would not be granted in this case because of improper venue. *Id.* This same proposition was acknowledged again by the court in the venue discussion when it stated, "[i]n order to accord plaintiffs

---

upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sec-

tions 8(g)(1) and 10(a)(1) of the Contract Disputes Act of 1978. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

the option of remaining in the district court where their monetary claims against the United States exceed $10,000, courts have generally permitted plaintiffs to waive their right to recover in excess of $10,000 so as to bring their claims within the scope of the Little Tucker Act." *Id.* at 1162. However, because the amendment would have been futile because some of the opt-in plaintiffs resided in multiple judicial districts and thus venue was not proper, no amendment to limit the right of recovery was permitted. *Id.* at 1162–63. Interestingly, in the background section of the opinion, the court noted that the action was "commenced by the six named plaintiffs...on their own behalf, and on behalf of more than 700 similarly situated employees of the Customs Service *who have filed consent forms to participate in this action as 'opt-in' plaintiffs.*" *Id.* at 1156 (emphasis added). Here, no consent forms have been filed by any of the absent prospective plaintiffs, and this class is unable to borrow the opt-in class action mechanism of the Fair Labor Standards Act.[18]

In *National Treasury Employees Union v. Reagan*, 509 F.Supp. 1337 (D.D.C.1981), the court had before it complaints in five separate cases which were consolidated for all purposes. The plaintiffs in these cases also sought to have the action certified as a class, and the court conditionally certified the class. *National Treasury*, 509 F.Supp. at 1340. A hearing was held at which the court requested the parties to:

address the limitation imposed by the Tucker Act, which provides, in substance, that the District Courts of the United States shall have original jurisdiction concurrent with the Court of Claims of civil actions or claims against the United States not exceeding ten thousand dollars ($10,-000.00) in amount which are "founded either upon the Constitution or upon contract with the United States."

*Id.* at 1342 (citations omitted). The court recognized all claims were properly based, and the individual plaintiffs "have amended their complaints specifically invoking the Tucker Act and limited their claims to ten thousand dollars ($10,000.00) or less." *Id.* Although the court realized it could later turn out that "members of the class may assert claims in excess of ten thousand dollars ($10,000.00), in which event bifurcation would be a possibility and transfer of the claims in excess of ten thousand dollars ($10,-000.00) to the United States Court of Claims would be another possibility," the court preferred to "cross that bridge when it comes to it." *Id.* at 1342–43.[19] The court in its opinion noted the Third Circuit had indicated in *Com. of Pennsylvania v. National Assoc. of Flood Insurers*, 520 F.2d 11 (3rd Cir.1975), that an individual claim of any class member for damages which would satisfy the Tucker Act is sufficient for the Court to retain jurisdiction. However a review of the *Pennsylvania* opinion shows the court did not expressly make that holding.[20] Instead, the court provided the following explanation:

18. For example, the Age Discrimination in Employment Act (ADEA) allows class actions to borrow the:

opt-in class action mechanism of the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b) (1994). Section 216(b) provides for a class action where the complaining employees are "similarly situated." Unlike class actions under Rule 23, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."

*Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir.2001), *petition for cert. filed*, 70 U.S.L.W. 3410 (2001); *see Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995) (ADEA incorporates section 16(b) of Fair Labor Standards Act; "difference between an ADEA representative action and a Fed.R.Civ.P.

23 class action is that the ADEA action follows an 'opt-in' rather than an 'opt-out' procedure").

19. Before the court had to cross the bifurcation bridge, it was given another bridge to cross. On appeal, the case was remanded to the district court for "further development of certain claims, consistent with this opinion." *National Treasury Employees Union v. Reagan*, 663 F.2d 239, 253 (C.A.D.C.1981). The remand opinion did not comment on the district court's discussion of the Little Tucker Act, waiver, and bifurcation.

20. In *Kizas v. Webster*, 492 F.Supp. 1135 (D.D.C. 1980), the plaintiffs' reliance on the decision in *Commonwealth of Pennsylvania v. National Assoc. of Flood Insurers*, was found to be "misplaced." *Kizas*, 492 F.Supp. at 1154. In that decision, the court of appeals:

merely noted that the District Court erred in aggregating the claims of class members in

We are concerned, however, that the summary dismissal by the district court might be interpreted as rejecting the viability of class actions under the Tucker Act where the aggregate class recovery from the Government may exceed $10,000. To construe our affirmance of the district court's dismissal of Count III as precluding class actions under the Tucker Act would be erroneous.

Tucker Act jurisdiction is properly invoked where the claim does not exceed $10,000 or where the claimant waives any amount sought in excess of the Act's jurisdictional limit. Where jurisdiction is based on § 1346(a)(2), it should not fail because the claimants sue as a class.

Accordingly, *if the district court would otherwise have had jurisdiction over each class member's claim were such claim presented separately,* Tucker Act jurisdiction would have been available even though when all individual claims were aggregated the total amount claim exceeded one billion dollars.

Here, the complaint reflects no individual claim of a class member, or of the Commonwealth, which would satisfy Tucker Act jurisdiction. Therefore, as we have stated the dismissal of Count II was correct for want of jurisdiction.

*Pennsylvania,* 520 F.2d at 25 (citations omitted) (emphasis added).

The class members in *Kizas v. Webster,* filed suit against their employer, the Federal Bureau of Investigation. Following the entry of a declaratory judgment and denial of injunctive relief, the case essentially became one for "money damages against the United States." *Kizas,* 492 F.Supp. at 1153. Plaintiffs asked to amend their complaint to assert jurisdiction under the Little Tucker Act but failed to specify the amount of damages they were seeking. *Id.* Plaintiffs alleged it was impossible to evaluate the amount of each

determining jurisdiction under the Tucker Act. The Court additionally noted that dismissal of all claims was proper since no individual class members' claim met the jurisdictional limits of section 1346(a)(2). Nowhere does the Court suggest that the District Court might have retained jurisdiction over the entire class if there were jurisdiction over some individual claims.

plaintiff's claim but did represent that "at least some members of the class have suffered damages of less than $10,000." *Id.* Ultimately, plaintiffs were given the option to elect to "have the entire action transferred to the Court of Claims," "to bifurcate the class, with [the] Court retaining jurisdiction over only those claims not greater than $10,000," or "pursue the entire action in this Court by waiving all claims in excess of $10,000.00." *Id.* at 1156. The court further provided that if the plaintiffs elected to "pursue all or some of their claims in this Court under the foregoing conditions, the Court will grant leave for plaintiffs to file a Second Amended Complaint alleging jurisdiction under the Tucker Act and pleading an amount claimed." *Id.* at 1156.[21]

In reaching their decision, the court found plaintiffs could offer no authority to support either of their theories of ancillary jurisdiction. Plaintiffs had suggested the court could retain jurisdiction because (1) there were some class members over which the court had jurisdiction allowing the court to retain jurisdiction over the entire class; (2) jurisdiction over all claims was proper under 28 U.S.C. § 1331 without regard to the amount claimed so all claims under the Tucker Act could be adjudicated as pendent or ancillary to the original claim; and (3) plaintiffs should not be required to allege an amount claimed until all matters relating to valuation had been determined and then only those claims in excess of $10,000 would be transferred to the Court of Claims for entry of judgment. *Id.* at 1153. In its discussion of these theories the court stated:

Jurisdiction over the claims of class members depends upon the amount claimed *individually* by class members. It is well-established that in class actions, the Court must have jurisdiction over *each* plaintiff; *claims of class members over whom the court lacks jurisdiction cannot*

*Id.* (citations omitted).

21. The employees elected to bifurcate the class. *Kizas v. Webster,* 707 F.2d 524, 533 (C.A.D.C. 1983). In accordance with their election, "the district court transferred all takings claims over $10,000 to the Court of Claims." *Id.* The claims of 612 employees were transferred. *Id.* at n. 40.

*be adjudicated as ancillary or pendent to the claims of those class members for whom jurisdiction lies.*

. . . .

Neither would it be proper for the Court to retain jurisdiction over all the damage claims pendent to the original constitutional claim under 28 U.S.C. § 1331. Plaintiff offers no authority for the proposition that damage claims against the United States can be adjudicated as ancillary to claims for which there is federal question or mandamus jurisdiction. Indeed, the Courts that have considered this argument have rejected it.

*Id.* 1154 (citations omitted) (emphasis added). In addition, to allow plaintiffs to wait until after the court has valued their claims would "frustrate the Congressional purpose of limiting the jurisdiction of the District Court." *Id.* at 1156.

 In conjunction with its analysis concerning class certification, the court in *Bywaters v. United States,* 196 F.R.D. 458 (E.D.Tex.2000), also provided insight into Little Tucker Act jurisdiction. In discussing numerosity, the defendant argued that plaintiffs "should not be allowed to use the size of their claims in favor of certification because they have voluntarily capped their recovery at $10,000 instead of pursuing larger claims in the Court of Federal Claims." *Id.* at 466. The court disagreed for two reasons. First, as the plaintiffs point out in this case, "[p]laintiffs are permitted to waive recovery in excess of $10,000 for jurisdictional purposes, and this Court will not penalize Plaintiffs for exercising that right." *Id.* Second, unlike the case here, the *Bywaters* court seemed reasonably sure that the claims would be "relatively small" although it was impossible at such an early stage of the case to determine the actual amount. *Id.* Despite the plaintiffs' reliance on the foregoing, the court also discussed jurisdiction in response to defendant's argument concerning numerosity based on the individual land owners. Defendant argued that basing numerosity on the number of individual land owners would "violate the purpose of the Little Tucker Act by allowing claims above $10,000 for a single parcel of property where there is more than

one owner." *Id.* at 465. Unpersuaded by this argument, the court stated:

The Supreme Court made it clear in *United States v. Will* . . . that jurisdiction under the Little Tucker Act is based on a determination that the *individual* claims of *individual* class members do not exceed $10,000 in amount. So long as *each separate claim* of *each class member* does not exceed $10,000, it makes no difference that one land parcel may have more than one owner, or that one person may own more than one land parcel in issue.

*Id.* (citations omitted) (emphasis added). Thus, because this Court must look at each individual class member's claim to determine jurisdiction pursuant to the Little Tucker Act, it follows that the Court must also look for an affirmative waiver from each class member in order to assert jurisdiction over claims in excess of $10,000. *See Roedler v. Department of Energy,* 255 F.3d 1347, 1351 (Fed.Cir.2001) ("district court may permit multi-plaintiff Little Tucker Act cases to proceed when each plaintiff waives recovery in excess of $10,000, even when potential liability exceeds $10,000"); *Chula Vista City School Dist. v. Bennett,* 824 F.2d 1573, 1579 (Fed.Cir.1987) ("claim of each member of the class must be examined separately to determine whether it meets the jurisdictional requirement"; only 6 members of the 55-member class presented claims which did not exceed the $10,000 limit; "only those six claims were properly before the district court"; the 49 remaining claims were remanded to district court for dismissal for lack of jurisdiction); *O'Meara v. United States,* 59 F.R.D. 560, 567–68 (N.D.Ill.1973)(district courts do not have Tucker Act jurisdiction over claims against United States greater than $10,000; proposed class definition will have to limit class to those persons who would otherwise qualify as class members and whose projected benefits would not exceed $10,000); *see also Brooks v. Weinberger,* 637 F.Supp. 22, 24–25 (D.D.C.1986) (multi-plaintiff case where all of the opt-in plaintiffs in this Fair Labor Standards Act case did not expressly waive right to recover in excess of $10,000; plaintiffs by opting-in were bound by the complaint's limi-

tation of damages "not in excess of $10,000" and district court had subject matter jurisdiction); *see also Loudner v. United States*, 108 F.3d 896, 900 (8th Cir.1997)(jurisdiction of district courts under Little Tucker limited to claims not exceeding $10,000, and *"each of the plaintiffs* alleges that his or her individual claim is less than this amount") (emphasis added).

Despite these holdings, the Court is mindful of several cases where plaintiffs were able to avoid diversity jurisdiction in federal court by limiting the amount of damages sought on behalf of themselves and their prospective class members. *Fields v. Oakwood Mobile Homes*, Inc., 71 F.Supp.2d 1205 (S.D.Ala. 1999); *Seroyer v. Pfizer*, 991 F.Supp. 1308 (M.D.Ala.1997); *Quebe v. Ford Motor Co.*, 908 F.Supp. 446 (W.D.Tex.1995). In *Fields*, plaintiff sought to represent a class of individuals "who similarly desire[d] to pursue only compensatory damages in an amount that [did] not satisfy the jurisdictional prerequisites of this Court." *Fields*, 71 F.Supp.2d at 1207. The court explained:

> To ignore this right to "opt out" when analyzing issues concerning the authority of a proposed class representative to waive claims of other putative class members and, as in this case, issues concerning the requisite jurisdictional amount in controversy, is to put the cart before the horse. The claims in a Rule 23(b)(3) class action, whether limited or expansive, are necessarily defined by the plaintiff who seeks to represent the putative class of similarly situated individuals. One of the purposes of the "opt out" provision is to allow any putative class member who disagrees with either the plaintiff's definition of claims or even the plaintiff's choice of forum to exclude themselves from the litigation and proceed on their own accord.

*Id.* The court concluded:

> Thus, the plaintiff who seeks only to represent a class of similarly minded individuals

would surely owe no duty to individuals who opt out of the litigation. Such plaintiff should not be denied her choice of forum and right to limit and/or waive certain claims solely on the basis that she has failed to represent the interests of individuals who will choose to opt out and to whom thereby she owes no duty. Rather, such plaintiff should encounter only the possible denial of class certification in the event she fails to establish that she can adequately represent the interests of a sufficient number of similarly situated and similarly minded individuals.

*Id.* at 1208. Likewise in *Pfizer*, the court noted the defendant's concern that plaintiffs, as fiduciaries of the proposed class, could not waive the right of the class to obtain all relief possible, was an issue to be taken up during the class certification. *Pfizer*, 991 F.Supp. at 1316. The court stated that concerned class members worried about the apparent waiver could be granted the opportunity to opt out of the proposed class. *Id.* This rationale was echoed in *Quebe* when it was noted that the failure by the plaintiff to request punitive damages might prevent the certification of the case as a class action but was "a long way from requiring that the present plaintiffs [to] plead a claim for punitive damages in order to proceed with their lawsuit." *Quebe*, 908 F.Supp. at 453. In a footnote, the court discussed that an appropriate remedy for any person believing punitive damages were appropriate could be to "opt out of the class action suit and pursue their own remedy." *Id.* at n. 6. Although the situations in the above cases factually parallel the issue here—plaintiffs seeking to limit the class claims, this Court notes the above cited cases are legally distinguishable because they do not involve the historical nuances of the waiver of sovereign immunity and therefore this Court declines to award the representative class members in this Little Tucker Act case that same power.[22]

> [I]t will be found that the doctrine is derived from the laws and practices of our English ancestors; and while it is beyond question that from the time of Edward the First until now the king of England was not suable in the courts of that country, except where his consent had been given on petition of right, it is a

---

**22.** The doctrine of sovereign immunity "has its origin in the ancient myth that the '[K]ing can do no wrong.'" *United States v. Dalm*, 494 U.S. 596, 622, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990) (Stevens, J., dissenting). Further insight into the doctrine of sovereign immunity is found in the following discussion:

As previously discussed and as defendant contends, it is black letter law that the Court in a class action must have jurisdiction over each claim in the class in order for the class action to proceed. Defendant argues it defies logic that this Court can certify a class and issue a notice to class members requiring them to opt out if they do not want to be a part of the litigation while at the same time the Court does not have jurisdiction over those same class members whose claims exceed $10,000. Because subject matter jurisdiction is always the initial inquiry for the Court, any order concerning class members over which it lacks jurisdiction would not be valid. Moreover, because the circuit courts have rejected attempts at invoking supplemental jurisdiction over a Tucker Act claim, this Court does not have any basis for jurisdiction over the prospective class members whose claims exceed $10,000.

In passing the Little Tucker Act, Congress created a mechanism for people to file claims for relatively small amounts in their home district and not have to deal with the geography of the United States Court of Federal Claims (CFC).[23] To effectuate this Congressional design, courts have permitted plaintiffs to waive damages in excess of the $10,000 which otherwise vests exclusive jurisdiction in the CFC in order to allow these plaintiffs a choice of forums.[24] This procedure appears to require claimants to affirmatively and consciously limit their claim to $10,000 or less and not have it done for them (or to them) because of the fine print in a typical opt out class action notice.[25] The proposal by the current plaintiffs to make this an opt out class would effectively give the current

matter of great uncertainty whether prior to that time he was not suable in his own courts and in his kingly character as other persons were.

. . . .

There is in this country, however, no such thing as the petition of right, as there is no such thing as a kingly head to the nation, or to any of the states which compose it. There is vested in no officer or body the authority to consent that the state shall be sued except in the law-making power, which may give such consent on the terms it may choose to impose. Congress has created a court in which it has authorized suits to be brought against the United States, but has limited such suits to those arising on contract, with a few unimportant exceptions.

*United States v. Lee*, 106 U.S. 196, 205–06, 1 S.Ct. 240, 27 L.Ed. 171 (1882) (citations omitted). Pursuant to the Little Tucker Act, the United States has "waived sovereign immunity with respect to civil actions founded upon any Act of Congress or any regulation of an executive department." *Loudner v. United States*, 108 F.3d 896, 900 (8th Cir.1997). If Congress chooses to waive sovereign immunity, it can place limitations on the ability of a plaintiff to sue the United States, e.g. a limit on damages and no ability to have a jury trial.

23. Congress has also sought to make the Court of Federal Claims (CFC) "user friendly." Robert Meltz, *Takings Claims Against the Federal Government*, 18 A.L.I.-A.B.A. 475, 478 (1999). As stated by the Chief Judge of the CFC on September 10, 1997, the CFC is "uniquely 'The Citizens' Court" and strives to embody President Lincoln's admonition that "It is as much the duty of Government to render prompt justice against itself, in favor of citizens, as it is to administer the same against private individuals." *Id.* Congress allows the judges of the CFC to sit anywhere in the United States and to hold sessions "at such places and times as will allow citizens to appear before it 'with as little inconvenience and expense ... as is practicable.' " *Id.* (alteration in original).

24. The U.S. Court of Claims, the predecessor of the United States Court of Federal Claims was created in 1855 "primarily to relieve the pressure on Congress caused by the volume of private bills." Robert Meltz, *Takings Claims Against the Federal Government*, 18 A.L.I.-A.B.A. 475, 477 (1999). With the enactment of the Tucker Act in 1887, the jurisdiction of the Court of Claims was greatly expanded to include "virtually all money claims against the United States save those sounding in tort or admiralty." *Id.* Following the Act of February 24, 1925, the court organized itself into two divisions: trial and appellate. The trial division consisted of "commissioners," (now trial judges) who were appointed by the court. The judges in the appellate division were nominated and confirmed pursuant to Article III of the Constitution. *Id.* Congress, in 1982, split the functions by placing the trial jurisdiction in a U.S. Claims Court and the appellate function into a "newly created U.S. Court of Appeals for the Federal Circuit." *Id.* Ten years later, Congress changed the name of the Claims Court to "U.S. Court of Federal Claims." *Id.* These courts follow, as binding precedent, the decisions of the pre–1982 Court of Claims. *Id.* at 478.

25. In *Hash v. United States,* No. CV 99–324–S–MHW, 2000 WL 1460801, at *9, (D.Idaho, July 7, 2000), the court noted the Rules of Procedure for the Court of Federal Claims provides certification for opt-in classes only.

plaintiffs the power to limit their neighbors' claims, notwithstanding earlier inconsistent statements by the current plaintiffs that their own claims far exceed $10,000.[26] In an effort to explain the amount of their earlier claims, plaintiffs offer the following:

[T]he Plaintiffs' FTCA filings were made at a time when the impact to the Plaintiffs' property values and the extent of the contamination was unsure. Thus, prudence dictated that the FTCA notice be given for the maximum possible recovery: the homes' total value. Now, Plaintiffs have chosen to drop all causes of action under the Federal Torts [sic] Claims Act and instead seek recovery under the Little Tucker Act. Despite the government's continual attempts to dictate what the Plaintiffs "really" want, the law remains clear that plaintiffs control their destiny, not the defendant. "The amount of a claim under the Little Tucker Act, for jurisdictional purposes, is based on the actual recovery sought by a plaintiff pursuant to that claim and is not based on the potential worth of the claim." *Smith v. Orr*, 855 F.2d 1544, 1553 (Fed.Cir.1988). These Plaintiffs, by their pleading, are seeking to recover no more than $10,000, inclusive of attorney fees, prejudgment interest, and all other recoverable costs.

Plaintiffs' Reply to Defendant's Response to Motion for Class Certification (docket # 66, page 2). Moreover, plaintiffs contend the current state of damages testimony leads them to believe the average diminution to their property is between $7,715 and $9,644, which is clearly less than the $10,000 statutory limit. Because under the new proposed class definition all claims are limited to $10,000, plaintiffs contend all jurisdictional problems alleged by the defendant are cured.

The Court has carefully considered all of the foregoing arguments. In reviewing the decisions in which a waiver of the Little Tucker Act was made, it appears the courts required an affirmative waiver from each plaintiff involved which lends credence to this Court's decision not to exercise jurisdiction erroneously over prospective plaintiffs. Also telling is the plaintiffs' assertion that "they" control their own destiny, "they" have chosen

---

**26.** Attached to defendant's response to plaintiff's motion for class certification, are excerpts from plaintiffs' depositions concerning the value of their property. In his deposition, Mr. Quintanilla stated he bought his property for $8,000 in 1952, and placed a deed restriction on this property when he sold it in 2000, for his asking price of $46,500. Prior to the sale, he filed several tax protests based on the fact that his property was contaminated. As a result, Bexar County Appraisal District valued his property at $25,000 in 1998 and 1999, and $30,500 in 2000. In his administrative claim filed June 13, 1995, he sought the following losses: $6,500 for destruction of his home by noise pollution; $24,000 for contaminated soil and water; and $5,000 for groundwater pollution.

Plaintiff Yolanda Johnson purchased her property in 1965, for $11,000; made improvements in the amount of $12,000 in 1987. For tax purposes, her home was valued at $43,200 in 1999, and $47,500 in 2000. She sought the sum of $100,000 for groundwater contamination and damage to property in 1998 when she filed her administrative claim with the Air Force.

Plaintiff Patricia Medina has owned her property for approximately 11 years. Although she executed a promissory note in the amount of $22,000 to purchase the property, she does not remember what her down payment was nor the dollar amount of the improvements she made. Her home for tax purposes was valued at $20,600 in 1998 and 1999, and $36,200 in 2000. Her administrative claim was filed in December of 1998, seeking $100,000 for contamination on her property.

Plaintiff Emma Baily purchased her property in 1980 for the sum of $25,000. She rented this property for $546 per month in 1982. She obtained a $30,000 home improvement loan in 1999. In 1998, her home was valued for tax purposes at $50,000, and lowered to $38,000 in 1999 following her protest due to the chemicals underground. Her home in 2000 was valued at $61,500, but she testified she believes the actual value is $38,000. Ms Bailey also filed an administrative claim for $100,000 for property damage although she testified at her deposition that the claim was for damage to her health.

Plaintiffs Dominga and Cruz Adames purchased their property in 1973, but do not recall the purchase price. The only improvement to the home was some re-tiling. The Bexar County Appraisal District appraised the property at $38,000 in 1998, but lowered the value to $31,000 in 1999 following a tax protest. The appraisal in 2000 was $51,000. Despite this appraisal, Ms. Adames believes she could sell this property for only $10,000 because of the contamination. The contamination did not prevent Ms. Adames' son from building on an adjoining lot two years ago, which Ms. Adames deeded to him. Her administrative claim was filed in October of 1998 and sought $100,000 solely for property damage.

to drop their causes of action under the Federal Tort Claims Act, and "they" are seeking to recover no more than $10,000, inclusive of attorney fees, prejudgment interest, and all other recoverable costs. While this Court no doubt has jurisdiction over the current plaintiffs, and any others who wish to join in, the Court finds under the present state of the law and the fact that the damages claimed by prospective plaintiffs may likely exceed the $10,000 exclusive jurisdictional limit of this Court, without an affirmative waiver and this Court's unwillingness to make that waiver on behalf of prospective plaintiffs, this Court must not exercise jurisdiction where none exists. This jurisdictional defect cannot be cured by the issuance of an opt-out notice.

Moreover, even if this Court has jurisdiction over all of the prospective plaintiffs through the asserted waiver by the named plaintiffs, the Court further finds that it would not be able to certify the class pursuant to rule 23 of the Federal Rules of Civil Procedure.

### *Class Certification Pursuant to FED. R. CIV. P. 23*

 As previously discussed, the motion for class certification proposes a class definition as follows:

> All current property owners of single family residential property who reside in the Western District of Texas, and who owned their property on or before July 1, 1995, or sold their property on or after July 1, 1995 and disclosed the presence of contamination on the property to the buyer, and whose total claims are $10,000 or less and whose property lies within the pollution plume, as identified by the United States Air Force shown on Exhibit "A" (Landata composite plume map).

Plaintiffs believe class certification is appropriate under both rule 23(b)(1) and 23(b)(3) of the Federal Rules of Civil Procedure. Rule 23(b)(1)(B) allows for the certification of a class if "the prosecution of separate actions by or against individual members of the class would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest." FED. R. CIV. P. 23(b)(1)(B). Plaintiff contends both sides in this case would become subject to potential defenses or claims of collateral estoppel based on the outcome of the first trial. That outcome could substantially affect or extinguish the rights of other plaintiffs not participating in the first trial such that those plaintiffs would never have their day in court.[27] Plaintiffs also believe questions of law and fact so predominate over any questions affecting individual members that a class action is superior to other available methods for the fair and efficient adjudication of this controversy which would satisfy the requirements of a rule 23(b)(3) class. Plaintiffs further say they satisfy the prerequisites to a class action set forth in rule 23(a), i.e., numerosity, commonality, typicality, and adequacy of representation. Defendant disagrees.

 As set forth in *Bywaters*, the legal standard for class certification is as follows:

> Certification of a class is appropriate where the party seeking certification demonstrates that the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are satisfied. Specifically, Rule 23(a) provides that:
>
> > One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so

27. Three practical differences between class actions in the district courts and class actions in the Court of Federal Claims have been recognized. *Cooke v. United States,* 1 Cl.Ct. 695, 697 (1983). Those differences were explained as follows:

> (1) under our rule, class members are not bound by adjudication of the class action unless they specifically opt into the case; (2)

there is generally little or no possibility of inconsistent adjudications of the same issue since the jurisdiction of this court is usually exclusive; and (3) because the defendant in our cases is always the same—the United States—it may be bound by adverse determinations even vis-a-vis individuals who are not parties to the litigation.

*Id.* at 697–98 (footnotes omitted).

numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Before certifying a class action, the trial court must perform a rigorous analysis and be satisfied that Rule 23(a)'s numerosity, commonality, typicality and adequacy of representation requirements are met.

In addition to satisfying Rule 23(a) prerequisites, the party seeking class certification must establish that the action is maintainable under at least one provision of Rule 23(b).

. . . .

Class certification is a procedural determination only. Although the court must make a "rigorous analysis" of the Rule 23 prerequisites, it is not appropriate to examine the merits of the case at this point. However, the Supreme Court has recognized that it may "sometimes be necessary for the court to probe behind the pleadings before coming to rest on the certification question."

The district court maintains substantial discretion in determining whether to certify a class action. In light of the fact that Rule 23 provides a district judge with great flexibility to adopt appropriate procedures, certify conditionally, or decertify a class in later stages of litigation, the Fifth Circuit has held that judges should err in favor of certification.

*Bywaters v. United States*, 196 F.R.D. 458, 462–63 (E.D.Tex.2000) (citations omitted).

### Rule 23(a) Prerequisites

### 1. Numerosity

■■■■ Plaintiff contends the anticipated number of class members is approximately 16,500. This number has been determined by plaintiffs' analysis of defendant's maps which show which properties have been invaded by the pollution plumes allegedly released from Kelly. Although defendant concedes the showing necessary to demonstrate numerosity is not great, defendant argues plaintiffs have failed to present any evidence demonstrating the size of a class consisting of those who have affirmatively waived their right to seek damages in excess of $10,000.[28] A class confined to the named plaintiffs does not satisfy this requirement because they are already joined in this Court.

■■■■ The prerequisite of numerosity is met when the "joinder of all members is impracticable." *Bywaters*, 196 F.R.D. at 465. Although plaintiffs do not have to give the exact number of potential class members, they must present some evidence or

---

**28.** As presently defined, the class is to consist of "[a]ll current property owners of single family residential property who reside in the Western District of Texas, and who owned their property on or before July 1, 1995, or sold their property on or after July 1, 1995, and disclosed the presence of contamination on the property to the buyer, and whose total claims are **$10,000 or less**." (Emphasis added.) Defendant has provided evidence that the claims of these single family residential property owners are likely to exceed $10,000 because they are entitled to recover prejudgment interest, attorney's fees and costs. Therefore, it appears that the definition may need to be amended to include those plaintiffs who seek to waive claims in excess of $10,000. *O'Meara v. United States*, 59 F.R.D. 560, 568 (N.D.Ill.1973) (proposed class definition will have to limit class to those persons who would otherwise qualify as class members and whose projected benefits would not exceed $10,000); *see Schneider v. United States*, 197 F.R.D. 397, 402 (D.Neb.2000) (class certification of class of all persons who own interest in land now occupied or controlled for trail use and "who have been damaged in the amount of $10,000 or less" or "who waive claims exceeding $10,000"). This Court has the discretion to define the class and is not required to follow verbatim the definition requested by the plaintiffs. *Schneider*, 197 F.R.D. at 401; *see Bertulli v. Independent Ass'n of Cont'l Pilots*, 242 F.3d 290, 296 (5th Cir.2001)(district court could have defined class to include all pilots; district court may choose one possible class definition over another to ensure requirements of rule 23 best satisfied); *Lundquist v. Security Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2nd.Cir.1993) (district court not bound by class definition proposed in complaint and empowered to carve out an appropriate class), *cert. denied*, 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993). Although rule 23(c)(4) provides the vehicle by which a court can carve out a more appropriate class, a court is "not obligated to implement Rule 23(c)(4) on its own initiative." *Lundquist*, 993 F.2d at 14.

reasonable estimate of the number of purported class members. *Id.* A court must not focus on sheer numbers alone but should also consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Id.* The Fifth Circuit has indicated that a class containing between 100 and 150 members generally satisfies the numerosity requirement and whether the numerosity requirement is satisfied is left to the sound discretion of the district court handling the litigation. *Id.*

 Here, according to the proposed class definition, plaintiffs seek to represent those single family residential property owners whose total claims are $10,000 or less. Plaintiffs maintain the number of anticipated class members is 16,500. When challenged by the defendant's argument that property owners in an inverse condemnation proceeding may recover prejudgment interest, attorney's fees, and costs in addition to the diminution in value, plaintiffs responded they were limiting their amount of recovery to $10,000 which prompted the jurisdictional discussion concerning waiver. Regardless of whether the class is to be composed of those whose claims are less than $10,000 or those who wish to affirmatively waive recovery, plaintiffs have not provided the Court with any evidence or estimate of what that number may be. A mere statement that there are approximately 16,000 single-family residences owned by individuals living within the Western District is insufficient given the jurisdictional parameters within which this Court must operate. Although plaintiffs contend the defendant's argument that numerosity can be met only after the unnamed plaintiffs waive their claims in excess of the $10,000 is incorrect and nonsensical, the Court finds that argument has merit. Given the parameters of this Court's jurisdiction, there appears to be no evidence or reasonable estimate of the number of the potential class members who will allow waiver or whose claim falls below the $10,000 jurisdictional maximum. A mere allegation without more that the class is too numerous to make joinder practicable is insufficient. *Pederson v. Louisiana State Univ.,* 213 F.3d 858, 868

& n. 11 (5th Cir.2000); *Fleming v. Travenol Labs., Inc.,* 707 F.2d 829, 833 (5th Cir.1983).

 Other factors the courts are asked to consider in making the numerosity determination are: "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Bywaters v. United States,* 196 F.R.D. 458, 465 (E.D.Tex.2000). Here, the plaintiffs have limited the class to those plaintiffs who reside in the Western District of Texas in order to avoid the venue issue. In addition, the class members are easily identifiable through the Bexar County property records. Unlike *Bywaters,* this Court is unable to deduce the "likelihood that individual claims are relatively small," given the analysis of additional damages which may be recovered and the initial administrative claims filed by the named plaintiffs. Therefore, this Court is not persuaded that plaintiffs have met the numerosity requirement of rule 23(a)(1).

### 2. Commonality

Commonality is satisfied if one issue of law or fact is common to the class and it affects all or a significant number of the putative class members. Defendant maintains, however, the proposed class is really a collection of individual claims over which there is no common issue for resolution. Because of the migratory nature of groundwater and the possibility of additional sources other than Kelly as the contaminator, each claimant must prove the source and degree of contamination from each source. In addition, defendant maintains each class member will be subjected to a series of defenses turning upon the facts of their particular situation. In response, plaintiffs argue there are indeed two common issues of fact and law at the core of this case: did the defendant cause the contamination plumes and does the entry of such contaminants underneath plaintiffs' properties constitute a taking for which compensation is owed under the Fifth Amendment of the United States Constitution? Plaintiffs assert defendant does not dispute the existence of these issues but tries to shift the focus towards what it labels as "non-

168

common issues." The Court agrees with plaintiffs' analysis and finds the commonality requirement has been fulfilled for rule 23(a) purposes. *See Bywaters,* 196 F.R.D. at 466–67 (burden of establishing commonality under 23(a) less stringent than under 23(b)(3); commonality established where resolution of at least one issue will "affect all or a significant number of the putative class members").

### 3. Typicality

■■■■■ For plaintiffs to fulfill the requirement of typicality, they must show their claims "are typical of claims of the class" and this test is not "demanding." *Id.* at 467. The focus for this inquiry is "on the similarity between the named Plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Id.* Typicality is found to exist when "the same 'legal and remedial theories' support the claims of named and unnamed plaintiffs." *Id.* Typicality exists when the claims of both named and unnamed class members stem from "the same event or course of conduct and are based on the same legal theory" even if factual distinctions exist between these same members. *Id.*

Plaintiffs assert they, like plaintiffs in *Bywaters,* have met the typicality requirement because their claims as well as those of the entire class arise from the common course of conduct of the government and all of the class members share a common legal theory, i.e., all class members own land within a specified area and as property owners are seeking just compensation under the Fifth Amendment through the Little Tucker Act. The Court finds plaintiffs have met the typicality requirement.

### 4. Adequacy of Representation

■■■ Rule 23(a)(4) requires the class representatives and their counsel to "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). To meet this requirement, two elements must be satisfied: (1) concerns regarding the qualifications of counsel and (2) concerns regarding "the relationship between the interests of the class representatives and the interests of the other class members." *Jenkins v. Raymark In-*

*dus., Inc.,* 109 F.R.D. 269, 273 (E.D.Tex. 1985), *aff'd,* 782 F.2d 468 (5th Cir.1986). The Court must be sure there is an absence of conflict and be assured vigorous prosecution. 1 NEWBERG ON CLASS ACTIONS § 3.22, at 3–126. Defendant does not appear to challenge the adequacy of counsel, and this Court does not question counsel's abilities.

Plaintiffs' counsel have experience in and have handled numerous prior class actions and are frequent speakers and authors on the subject of class actions. During the past five years, counsel have represented classes in the following actions: (1) 600 tenants in a suit against the owner of an apartment complex built over environmentally contaminated land. This case was tried to a jury and resulted in a multi-million dollar judgment against the defendant. Subsequently, a second lawsuit was filed against the insurance company for failure to pay claims for wrongful eviction. This suit ended with a multi-million dollar settlement. (2) 225 property owners near Dallas claiming pollution damages against a neighboring property owner. (3) A federal class action against a pension, retirement plan owned by a hospital in Palestine, Texas. (4) In addition to the instant case, counsel are currently handling three other cases involving class action allegations. Therefore, this Court has no concerns about the adequacy of representation the class will receive from chosen counsel.

Plaintiffs seek to have Yolanda Johnson, Patricia L. Medina, Armando C. Quintanilla, Dominga Adames, Emma Bailey, and Aurora Lehman appointed as class representatives. The named plaintiffs are members of the proposed class and have expressed an interest in representing the class. All of these plaintiffs either own or have owned property lying within the pollution plumes identified by the United States Air Force and therefore, their claims are typical of the claims of all other class members, and there is no conflict between their claims and those of any other class member.

Defendant maintains the proposed class representatives cannot satisfy the common interests prong because their interests are antagonistic to those of the absent class members. In support of this assertion, de-

fendant points to the fact plaintiffs and the proposed class have had information concerning the alleged pollution on and off the Kelly base since the 1980s and have not chosen until now to file claims or suits against the United States. Defendant contends some of the government's exhibits show some of the levels of pollution are very small and have no effect on the property use or property value. Although plaintiffs have every right to challenge these facts, the absent class members have every right to accept them and refrain from suit. In addition, plaintiffs have elected to sue for a taking of property instead of under a tort theory and have limited the total amount of recovery to $10,000. The absent class members, obviously, have not made the same weighty decisions concerning their interests or have elected not to pursue litigation. Accordingly, the conflict between the absent class members and the class representatives is obvious and irreconcilable.

 As set forth by the Fifth Circuit in *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 625–26 (5th Cir.1999), *cert. denied*, 528 U.S. 1159, 120 S.Ct. 1169, 145 L.Ed.2d 1078 (2000), "[d]ifferences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." The adequacy of representation requirement is fulfilled if the interests of the named plaintiffs are aligned sufficiently with the interests of other members of the class. *Bywaters*, 196 F.R.D. at 468. The issues must be similar not identical. *Id.* A sufficient alignment of interests is found to exist when "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class." *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F.Supp.2d 942, 955 (E.D.Tex.2000) (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir.), *aff'd following remand*, 659 F.2d 1322 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, *and cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982)).

Again returning to the jurisdictional parameters of the Little Tucker Act, the Court finds the adequacy of representation requirement is not fulfilled because the interest of the plaintiffs in staying within the jurisdiction of the district court does not achieve the maximum possible recovery for each class member given the possibility that the absent members may choose to recover not only the diminution in value but prejudgment interest, attorney's fees, and costs as well. *See Seroyer v. Pfizer*, 991 F.Supp. 1308, 1316 (M.D.Ala.1997) (issue to be taken up during class certification is concern of waiver on behalf of putative class members; court could conclude plaintiffs are not adequate class representatives but court should not force plaintiffs to seek more then they want); *Quebe v. Ford Motor Co.*, 908 F.Supp. 446, 453 (W.D.Tex.1995) (while failure to request punitive damages might prevent certification of the present case as class action, it is long way from requiring present plaintiffs to plead for punitive damages in order to proceed with their lawsuit); *see also Fields v. Oakwood Mobile Homes, Inc.*, 71 F.Supp.2d 1205, 1208 (S.D.Ala.1999) (recognizing class certification should only be denied in event plaintiff fails to establish she can adequately represent interests of a sufficient number of similarly situated and similarly minded individuals and not because plaintiff chooses to limit recovery). Here, plaintiffs not only seek to limit their recovery but have also failed to show there are a sufficient number of similarly situated and minded individuals who wish to limit their claims to $10,000 or less. Thus, class certification would also fail on this ground. Having found, in the alternative, that even if this Court had jurisdiction, the class would not meet the requirements of rule 23(a), the Court need not discuss the requirements of 23(b).

Because the Court finds that a class action should not be certified at this time, the effect, should the plaintiffs wish to continue in this Court, is that notwithstanding the technical preclusion of an opt-in class, the practical result for those who choose to participate in this litigation will be on an "opt-in" basis. One of the logistical challenges in class actions or multi-plaintiff cases is that of reasonable notice to all interested parties. In most instances of which this Court is

aware, potential plaintiffs have little or no idea of the alleged cause of action and plaintiffs' counsel faces the task of communicating with an amorphous and anonymous group. Such is the not situation here. Because of widespread media attention and ongoing meetings among neighborhood leaders and local, state, and federal representatives involved in the base closure process, it is unlikely anyone in the affected area does not know about the environmental controversy. Moreover, the addresses to which notice would be sent are known because of the plume maps already before the Court. *See, e.g.*, Appendix A which apparently was mailed to those who live in the community surrounding Kelly and comprising those who are potential plaintiffs.

The current plaintiffs as leaders in their neighborhoods, other interested community groups, and the very able plaintiffs' counsel can no doubt devise a method to give potential plaintiffs an opportunity to join as $10,000 or less plaintiffs within a reasonable time period. Indeed, such a process may be legally and logistically better than what the current plaintiffs propose. In contemplating the current plaintiffs' and their counsels' request for an opt-out class, the admonition of "be careful what you ask for because you might get it" comes to mind. This case will likely take years to resolve and will require the investment of sizeable amounts of labor and capital. A multi-plaintiff lawsuit would give the additional opportunity for the significant costs of this litigation to be borne by a modest contribution from those families who truly have a perceived grievance and wish to participate. If the current plaintiffs are correct in their assessment that thousands of families have been wronged and want to litigate, a rather substantial sum could be accumulated to address the significant burdens plaintiffs and their counsel face because of the uniqueness of each parcel of improved real estate possibly to be litigated in this

matter. *Cf. Bywaters v. United States*, 196 F.R.D. 458, 466 (E.D.Tex.2000) (action involved a 56–mile rail corridor divided into 468 apparently unimproved parcels).

### Motion for Recusal of Trial Judge

Some federal court employees in the clerk's office, probation, pretrial, and other offices may own property in the area in question. Should they choose to file claims, they can do so in the United States Court of Federal Claims or a visiting judge may be requested if a separate Little Tucker Act suit is filed in San Antonio. Accordingly, IT IS HEREBY ORDERED that the Motion for Recusal of Trial Judge (docket # 60) is DENIED AS MOOT.

### Conclusion

Based on the foregoing discussion, analysis, and finding that this Court lacks subject matter jurisdiction over the prospective class members absent affirmative waiver and the class as defined does not meet the requirements of rule 23(a), IT IS HEREBY ORDERED that Plaintiffs' Motion for Class Action Certification (docket # 16) and Plaintiffs' First Amended Motion for Class Action Certification (docket # 57) ARE DENIED; defendant's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404 (docket # 51–2) is DENIED AS MOOT, and defendant's Motion to Transfer to the Court of Federal Claims (docket # 27) and defendant's Motion to Transfer Pursuant to 28 U.S.C. § 1631 (docket # 51–1) are also DENIED. Plaintiffs are granted leave to pursue an interlocutory appeal if they choose or may proceed in this Court on a multi-plaintiff basis for those among the 16,500 property owners who wish to limit their claims to $10,000.

It is so ORDERED.

# Kelly Air Force Base

# **Restoration Advisory Board**

| | |
|---|---|
| What? | The public is invited to attend the quarterly meeting about the Kelly Environmental Program |
| When? | **Tuesday, July 17, 2001, 6:30 – 9:00 p.m.** |
| Where? | **Kennedy High School**<br>**1922 S. Gen. McMullen** |
| Questions? | For more information contact:<br>Doug Karas (210) 925-0217<br>doug.karas@kelly.af.mil<br><br>Spanish interpreters will be available. If a sign language interpreter is needed, please call (210) 925-0956 at least two days in advance. |
| ¿Qué? | El público está invitado a atender a la junta trimestral del Programa Ambiental de Kelly |
| ¿Cuándo? | **Martes, 17 de Julio 2001, 6:30 – 9:00 p.m.** |
| ¿Dónde? | **Kennedy High School**<br>**1922 S. Gen. McMullen** |
| ¿Preguntas? | Para más información, llame a:<br>Doug Karas (210) 925-0217<br>doug.karas@kelly.af.mil<br><br>Interpretación en español será disponible. Si necesita intérprete de sordera llame al (210) 925-0956 dos días antes de la junta. |